1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   SIERRA CLUB, et al.,                          No. C 05-00397 CRB

12              Plaintiffs,                         **MEMORANDUM AND ORDER**
                                                    **GRANTING MOTION FOR**
13       v.                                         **PRELIMINARY INJUNCTION**

14   DALE BOSWORTH, et al.,

15              Defendants.
                                            /
16

17          Currently pending before the Court is a motion by several plaintiff environmental

18   groups for a preliminary injunction.  Plaintiffs seek an order preventing the United States

19   Forest Service ("Forest Service" or "Service") from allowing intervenor Sierra Forest

20   Products to execute a 1999 contract authorizing timber cutting in the Sequoia National

21   Forest.  Plaintiffs contend that the Service violated the National Environmental Policy Act

22   ("NEPA") by failing to conduct the required analysis of newly available information

23   regarding the project's effect on the pacific fisher, a mink-like animal that faces extirpation

24   within the southern Sierra Nevada.  After carefully reviewing the record in this action and

25   having had the benefit of live testimony on this motion, the Court hereby GRANTS the

26   motion for a preliminary injunction.

27                               **BACKGROUND**

28          On June 30, 1999, the Forest Service approved a commercial logging project called

     the Saddle Fuels Reduction Project (the "Saddle project" or "the project"), which involves

the logging of about 31,000 trees over 2,000 acres of pacific fisher habitat in the southern Sierra Nevada mountains. This approval came after the Service prepared an Environmental Assessment ("EA"), which received comments from the plaintiffs in this action. The Environmental Assessment concluded that the project would cause no significant impacts to the human environment, and therefore the more thorough review involved in preparing an Environmental Impact Statement ("EIS") was unnecessary. The finding of no significant impact ("FONSI") was premised on, among other things, the determination that the project "would maintain suitable habitat and habitat elements necessary for . . . [the] fisher . . . to be well dispersed over the landscape." FONSI VII.9. The finding was also based on the conclusion that guidelines set up in 1993 to protect the California spotted owl would protect wildlife impacted by the project. See EA, p. 30. These mitigation measures, known as the CASPO guidelines, were designed to conserve features of the habitat--for example that no trees greater than 30 inches in diameter be cut[1]--that are necessary for the survival and sustainability of the spotted owl. Those features were also thought to be important for the fisher.

Three documents associated with the initial EA represent the Service's findings regarding the impact that the project would have on the fisher: the EA itself, the Wildlife Biological Evaluation ("BE") and the FONSI. The primary document analyzing the project's impact on the fisher, and the one on which the other two rely, is the Wildlife Biological Evaluation.

The BE, prepared by Service biologists, opens with the admission that "[c]urrently no viability analysis regarding appropriate population levels for marten or fisher has been conducted at the State or Regional level." BE at 5. The BE also acknowledges that the data available at the time indicated that "fisher distribution is shrinking" and "fisher are now absent or exist in low density" in some parts of California. Id. The report further states that

---

[1]Other guidelines include cutting shorter trees to maintain a canopy and leaving some wood on the forest floor.

1  "[w]hether this gap in distribution is effectively isolating the southern Sierra Nevada

2  population remains inconclusive." Id.

3      The report based its findings on the surveys which had revealed that the fisher

4  occupies stands with dense, but not necessarily uniform, overhead canopy of more than 40%

5  cover.  BE at 6.  Such stands are structurally complex, containing a combination of trees and

6  shrubs, a high density of snags, fallen trees, and limbs close to the ground.  Id.  The report

7  also found that fishers tend to live in conifers with a diameter in a range between 39" and

8  41.4" and their natal dens are found in trees with diameters of 34" and 45".  Id.  Fishers were

9  also said to live in areas of tree densities from 160 sq. ft. basal area per acre to 385 sq. ft. per

10  acre with a mean of 272 sq. ft. per acre.  Id.  Logging was seen as a potential threat to the

11  fisher because "[e]xcessive fragmentation of usable habitat from harvest clear cutting may

12  create sufficient openings to lower overall suitability."  Id.  Based on these findings, the

13  report concluded that of the 28,800 acre analysis area, 4,400 acres was considered "highly

14  suitable" for fisher resting, foraging and denning activity with an additional 120 acres

15  considered suitable for travel and foraging.  The remaining 14,495 acres were found to be of

16  only "limited value" to fisher.

17      The BE also considered the cumulative effects of the project when analyzed together

18  with other ecosystem threatening activities.  See BE at 14-15.  The report notes that between

19  1976 and the reporting period 88 MMBF (million board feet) of wood had been removed

20  through logging. BE at 14.  It also anticipated an additional 1 MMBF[2] would be removed

21  over the two years following the reporting period due to the Roadside Hazard and Safety

22  Hazard Removal Projects.  Id.

23      Pursuant to these findings, the BE concludes that use of CASPO guidelines and other

24  mitigation measures would protect the fisher such that the project was "not anticipated to

25  result in a substantial shift in habitat quality or quantity from what currently exists for fisher

26  and marten throughout the analysis area."  BE at 12.  In addition to the CASPO guidelines,

27

28      [2]In a later portion of the report, it states that these projects are estimated to result in 1.5 MMBF in reductions.  See BE at 15.

3

the report requires that a minimum of 175 sq. ft. basal area per acre be maintained for some areas and a minimum average of 160 sq. ft. per acre in others. Id. Post-project overhead canopy density was anticipated to be 40% and was expected to exceed 50% approximately 10 years after the project. Id.

Based on all of these findings, the report's ultimate determination is that the project, if implemented using CASPO guidelines and other specified standards and mitigations,

> 'may affect individuals' but would maintain a suitable habitat and habitat elements necessary for [marten, fisher, northern goshawk, and the California spotted owl] well dispersed over the landscape. Risk of largescale disturbances which would severely impact the species would be reduced. Therefore, the project action 'would not lead to a trend toward federal listing.'

BE at 16; see also EA at 33.

On November 2, 1999, the Saddle contract was awarded to intervenors. On April 15, 2000, President Clinton issued a Presidential Proclamation establishing the Giant Sequoia National Monument, which made commercial logging in a portion of the Sequoia National Forest illegal. The Proclamation provided an exception for preexisting timber contracts, that is "[t]imber sales under contract as of [April 15, 2000] and timber sales with a decision notice signed . . . prior to December 19, 1999."

Although the Saddle contract was initially slated to be completed by March 31, 2004, its termination date was extended twice because of the low price of timber. After receiving a press release stating that the Saddle project would finally commence on July 25, 2005, plaintiffs filed a motion for a temporary restraining order ("TRO") on August 8. The Court entered a TRO on August 10 and scheduled a hearing on the motion for a preliminary injunction on August 16. By stipulation, the parties agreed to delay the hearing until September 7 and extend the TRO until the Court ruled on the preliminary injunction motion. Ultimately, the Court held the hearing on September 6.

/ / /

/ / /

/ / /

4

**DISCUSSION**

**I. Preliminary Injunction Standard**

The traditional criteria for granting preliminary relief are: 1) a likelihood of success on the merits, 2) the possibility of irreparable injury, 3) a balance of hardships favoring the plaintiff, and 4) that the preliminary relief be in the public interest. Barahona-Gomez v. Reno, 167 F.3d 1228 (9th Cir. 1999). This test has evolved into the modern standard that the plaintiff must "demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1381 (9th Cir. 1987). While this test is phrased in the disjunctive, many courts view it as essentially a single test. Viewed as a single test, the greater the showing of likely success the lighter the burden in terms of the relative hardship, and vice versa. See Regents of Univ. of Calif. v. ABC, Inc., 747 F.2d 511, 515 (9th Cir. 1984).

**II. Likelihood of Success On the Merits**

Plaintiffs' central contention is that new information that has become available since the 1999 EA was prepared substantially alters the analysis performed at that time, therefore requiring further environmental review. They cite newly available academic studies of the fisher and three new commercial logging projects in the vicinity of the Saddle project area. According to plaintiffs, this new information requires the Service to engage in a supplemental environmental analysis of the Saddle project.

Under NEPA, an agency cannot rest on the conclusions made by an EIS or EA but instead maintains a continuing obligation to take a "hard look at the environmental effects of its planned action, even after a proposal has received initial approval." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989). The Supreme Court has held that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Instead, a supplemental EIS should be prepared if: (1) "there remains 'major Federal actio[n]' to occur" and (2) "if the new information is sufficient to show that the

5

1  remaining action will 'affec[t] the quality of the human environment' in a significant manner

2  or to a significant extent not already considered." Id.

3      At issue here is not only the Forest Service's failure to prepare an SEIS, but also

4  whether it properly considered new information as it came to the Service's attention. "[T]he

5  Forest Service's failure to evaluate in a timely manner the need to supplement the original

6  EIS in light of . . . new information violate[s] NEPA." Friends of the Clearwater v.

7  Dombeck, 222 F.3d 552, 559 (9th Cir. 2000). However, even where the agency has failed to

8  satisfy NEPA in this regard, it can rectify the violation after the onset of litigation by

9  conducting an appropriate analysis while the case is still pending. See id. at 560-61. Where

10  this analysis amounts to a "hard look," injunctive relief is inappropriate. See id. ("[I]t would

11  serve no useful purpose . . . to order the Forest Service to prepare studies that the Forest

12  Service has already completed and that cannot be successfully challenged.").

13      This Court reviews the Forest Service's decision to forego an SEIS under an arbitrary

14  or capricious standard of review. Friends of the Clearwater, 222 F.3d at 556. Under this

15  standard, the Court "must consider whether the decision was based on a consideration of the

16  relevant factors and whether there has been a clear error of judgment." Id. (quoting Marsh,

17  490 U.S. at 378). "Review under this standard is to be searching and careful, but remains

18  narrow, and a court is not to substitute its judgment for that of the agency." Id. (quoting Mt.

19  Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).

20      **A.  Newly available academic studies**

21      Plaintiffs first point to several post-1999 academic studies which they claim

22  substantially alter the assumptions made in the 1999 EA. According to plaintiffs, the new

23  studies reveal two important types of information about the fisher. First, the studies

24  illuminate the threat of extirpation to fisher in the Southern Sierra due to dwindling

25  population numbers and isolation from other fisher populations. Second, the reports

26  challenge the assumptions of the 1999 BE that fisher population can be sustained in areas

27  with canopy cover as low as 40%.

28

6

1    Regarding the fisher's sensitive status, Lamberson in 2000 published a study

2  containing demographic data indicating the fisher "may face imminent extinction."

3  See Barrett Dec. ¶ 6.  Professor Reginald Barrett stated at the hearing that, although this

4  study was based on still-limited data, it represents the "best science" on the subject.  That is,

5  it appears to be the most serious population viability analysis to date.  Further underscoring

6  the seriousness of extinction of the fisher population in the southern Sierra Nevada, other

7  studies published in 2003 concluded that the fisher population in the southern Sierra Nevada

8  constitutes a biologically "distinct population segment."  See id. ¶ 7 (citing Drew et al.

9  (2003) and Aubry & Lewis (2003)).

10    The Fish and Wildlife Service came to a similar conclusion in April 2004, when it

11  found that the fisher meets the criteria for placement on the endangered species list, but could

12  not be listed at that time because of the need to consider other petitions for listing.  See

13  "Endangered and Threatened Wildlife and Plants; 12-month Finding for a Petition to List the

14  West Coast Distinct Population Segment of the Fisher," 69 Fed. Reg. 18770 (April 8, 2004).

15  In that finding, Fish and Wildlife's review of the literature led to the conclusion that the

16  fisher population in the southern Sierra Nevada had become isolated from other populations.

17  See id. at 18771 (citing Truex et al. (1998), Lamberson (2000) and Zielinski et al. (1995)).

18  Fish and Wildlife noted that there still had not been any "good population estimates" for the

19  fisher in the western United States, including California.  Id.  However, the report does note

20  that of the "few estimates" of fisher population density that were available for the southern

21  Sierra Nevada, Zielinski et al. (2003) found 8 females per 100 km$^2$, while Lamberson et al.

22  (2000) estimated that there were between 100 and 500 individuals in the entire region.  Id. at

23  18772.  At the hearing, Dr. Barrett estimated that, based on his own analysis, there may be as

24  few as 50 individual fishers in the region.

25    The Fish and Wildlife report also makes important conclusions regarding the

26  biological significance of the fisher population in California:

27         The extinction of fishers in their west coast range would . . .
         result in the loss of a significant genetic entity, since they have
28         been described as being genetically distinct from fishers in the
         remainder of North America. More specifically, native fishers in

7

> California have reduced genetic diversity compared to other
> populations (Drew et al. 2003). Additionally, the extant native
> populations in California share one haplotype that is not found in
> any other populations (Drew et al. 2003).

Id. at 18,777.

This information, which appears to be grounded heavily in post-1999 studies, appears to have significantly altered the picture considered by the original BE. That document had admitted that "[c]urrently no viability analysis regarding appropriate population levels for marten or fisher has been conducted at the State or Regional level," and that whether dwindling fisher numbers "is effectively isolating the southern Sierra Nevada population remains inconclusive." BE at 5. The data cited in the Fish and Wildlife Service's review of the literature appears to confirm what was at most a suspicion on the part of the drafters of the BE: that there is a real threat of extinction to the southern Sierra fisher population. Indeed, new population analyses finding a small and shrinking number of individual fishers in the southern Sierra challenge the assumption that even though the project "may affect individuals" such effects could be dismissed given the mitigation measures designed to preserve necessary habitat conditions. See BE at 16; EA at 33.

Furthermore, the original BE did not consider the biological importance of the southern Sierra fisher, which post-1999 studies found to be genetically distinct. This view is underscored by the Fish and Wildlife's determination that the species could be listed. This is precisely the type of change in the "biological status" of a threatened animal that creates a duty to timely evaluate the necessity of a supplemental environmental review. See Friends of the Clearwater, 222 F.3d at 559 & n.5; cf. Swanson v. United States Forest Service, 87 F.3d 339, 344 (9th Cir. 1996) (finding that no SEIS was required where change in status of the chinook from "sensitive" to "threatened" "changed the legal status of the salmon, but [not] the biological status"). The new data appears to have substantially altered the basic assumptions of the BE in a "significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374. As such, the Forest Service had an obligation to take a

8

"hard look" at the information to determine whether a supplemental EA or EIS should be prepared.

Plaintiffs also claim that the studies contain new significant information regarding canopy cover requirements for fisher habitat. For example, Mazzoni (2002) found that the suitable canopy closure for fishers consisted of multi-story canopies creating a range of 60-100% cover. Zielinski (2004b) supported this view, finding that the average canopy closure for fisher rest sites was greater than 90 percent and that "resting fishers place a premium on continuous overhead cover." Indeed, the Forest Service's own 2001 Framework states that quality fisher habitat consists of greater than 60% canopy closure.

This data contrasts with the BE's finding that fisher-occupied stand "contained denser, but not necessarily uniform, overhead canopy (>40%)." BE at 6 (citing Ruggerio et al. 1994). This findings was clearly important to the ultimate conclusions of the BE and EA, which both relied heavily on mitigation measures to protect the fisher. The BE states that these measures "would maintain overhead canopy in excess of 40% immediately post harvest and are expected to exceed to 50% in approximately 10 years." BE at 12. The finding that this level of cover adequately protects the fisher is seriously called into question by the new data since these mitigation measures allow canopy cover to drop to levels at the bottom of the range found acceptable from the BE's review of literature on the subject--a level significantly below that which was found important by more recent studies. The 40% limit also demands further inquiry since the BE assumes that the fisher population is robust enough to sustain itself for the ten-year period during which canopy levels are replenishing to a level that may also, in light of the new information, be insufficient. The questions surrounding this assumption are even more serious in light of the new population figures and genetic data, since it would appear that environmental changes that might otherwise be insignificant may have a greater impact on a fisher population that may be smaller and more biologically importance than was initially thought.

That some or all of this information was new and substantial has essentially been admitted by the Forest Service. See Second Anderson Decl. ¶ 7 ("I do not disagree . . . that

new information on fisher exists which warrants reevaluation of the Saddle Project.") but see
id. (stating that this information has already been considered and dismissed as not substantial
enough to trigger an SEIS). The Forest Service was required by NEPA to take a "hard look"
at it to determine whether the original EA should have been supplemented. See Friends of
the Clearwater, 222 F.3d at 559. It is here that the Service mounts its main defense, arguing
that it has evaluated the new information in a manner that amounts to a "hard look."

The Forest Service states that prior to this litigation it revisited the findings of the EA
twice, in memos issued in April of 2001 and in May of 2002. However, neither of these
documents deal with any of the new information identified above. Instead, the 2001 memo
simply reiterates the findings of the EA and states that "[n]o significant new information was
brought forward in this review that would require project modification or supplement." The
2002 memo does not even mention the fisher or any other endangered species, but instead
only discusses the removal of dead and dying trees from along roads within the Saddle
project area. Most importantly, both memoranda preceded the Truex study and the Fish and
Wildlife determination, which both provided apparently new data regarding the biological
importance of the fisher. Therefore, the Court finds that these documents do not satisfy the
"hard look" requirement.

After plaintiffs' motion for a TRO was filed, the Forest Service also prepared a
Supplemental Information Report ("SIR") that "formally document[s] the ongoing review of"
the project to determine if it was necessary to prepare an SEIS. The SIR considers the impact
of newly published academic studies, the 2002 McNally Fire (which burned 150,700 acres
and came within five miles of the project area), and the removal of dead trees in the area. It
concludes that none of this information alters the findings of the original BE. With respect to
the population studies of fisher cited above, the SIR notes that an unpublished draft of the
Truex study "was available" and that the Ruggerio article cited in the EA "noted the isolation
of the western fisher population and its vulnerability." SIR at 4. The SIR also notes that
analysis preliminary to the 1999 EA took account of the studies that were the basis for the
2004 studies published by Zielinski et al. Id. The SIR continues with the statement that the

sensitive status of the fisher had been considered prior to 1999 when Gaffrey determined that managing the fisher population over the entire landscape was preferred to the designation of wildlife reserves.

Supplemental Information Reports are not mentioned by NEPA or by its implementing regulations. See Idaho Sporting Congress Inc. v. Alexander, 222 F.3d 562, 565-66 (9th Cir. 2000). Nonetheless, courts have upheld agency use of SIRs and other non-NEPA evaluation procedures for the purpose of determining whether a supplemental EA or EIS should be prepared. Id. The Supreme Court has found an SIR to satisfy an agency's NEPA obligations where the SIR demonstrated that the agency had "determined based on careful scientific analysis that the new information was of exaggerated importance" and therefore the agency had "conducted a reasoned evaluation of the relevant information. . . ." Marsh, 490 U.S. at 378. More generally, the Ninth Circuit has held that, in analyzing an agency's decision not to conduct a supplemental environmental review, a court must examine "such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with as statement of explanation or additional data." Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1024 (9th Cir. 1980).[3]

Here, all of the statements in the SIR apparently attempt to attack the notion that the studies discussed above are new, post-1999, information. However, this contradicts the statements in the 1999 BE which admit a significant lack of knowledge regarding the size and viability of the fisher population. The SIR does not acknowledge these inconsistencies or even attempt to address why the newly-identified biological importance of the fisher does

---

[3]While this test was articulated under the "reasonableness" standard that was overruled by Marsh in favor of an "arbitrary and capricious" standard, the Court finds that the analysis articulated in Warm Springs is still applicable. See Marsh, 490 U.S. at 375 n. 23 (noting that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." (citation omitted)).

1   not justify the consideration of a more conservative approach.[4]  Since the new studies were

2   not previously considered, the Service was under an obligation to take a "hard look" at them.

3   The SIR contains no reasoned analysis of these subjects and thus does not satisfy this duty.

4           The SIR's treatment of new data regarding canopy cover is similar in that it appears to

5   make the argument that the findings in the new studies were known at the time the EA was

6   prepared.  The SIR states that at the time the EA was prepared, "[t]he Forest identified that

7   stands with greater than 60% canopy closure and dominant trees greater than 24 inches dbh

8   were of importance to the fisher."  SIR at 5.  In apparent contradiction, the SIR goes on to

9   discuss, as the BE did, the fact that the post-project canopy cover could dip as low as 40%.

10  Most importantly, the SIR contains no discussion of the several findings cited above that

11  high levels of canopy cover, far above 40%, is important to the fisher.  Accordingly, the SIR

12  does not contain the required "hard look."

13          At the hearing, defendants provided the testimony of Steven Anderson, who stated

14  that he and other Forest Service officials had on a regular basis monitored the fisher

15  population and closely considered new data that had emerged about the animal.  Anderson

16  essentially argues that the Saddle project favors the fisher because it reduces the risk of stand

17  replacing wildfire--a risk thought to be greater for the fisher than the risk posed by thinning

18  of certain stands of trees.  Anderson also notes that the Saddle project thins only a small

19  number of trees in areas that are not often used by the fisher.  While this analysis may have

20  constituted the required "hard look," the fact that these findings were never set forth in

21  writing until the failed effort made in the SIR undermines such a view.  Defendants have

22  cited no precedent which would support the conclusion that an agency may demonstrate that

23  a "hard look" analysis has been made solely through testimony provided at a hearing or

24  through a declaration.  When produced in this form, information is presented for the specific

25  purpose of refuting the views of the plaintiffs and is therefore lacks the objectivity that

26

27          [4]For example, the Fish and Wildlife Service's August 31, 2005 letter, submitted in
    support of defendant's opposition, states that another fuels reduction project had been approved
    but only thins trees less than 11 inches in diameter such that canopy cover will not be
28  substantially reduced below 50-60%.  Apparently, this limitation was seen as an appropriate
    balance of fire prevention and habitat protection.

1    makes scientific analysis valid and reliable.  While this Court may review a non-NEPA

2    document such as an SIR in determining whether an SEIS should have been prepared, it is

3    doubtful that an analysis that was never documented could satisfy the Forest Service's

4    burden.  As such, the Court rejects the notion that Mr. Anderson's testimony and declaration-

5    -as well reasoned as they may be--demonstrate a "hard look."

6            Finally, the Forest Service requested that the Fish and Wildlife Service provide an

7    independent review of the effects of the Saddle project on the fisher population.  According

8    to the letter, the request was made on August 23 and the analysis, which included a field

9    visit, was completed by August 31.  In a letter setting forth their findings, the Fish and

10   Wildlife Service concludes that the Saddle project involves only a small proportion of high-

11   quality fisher habitat and therefore will not adversely impact the fisher.  The letter also states

12   that the project reduces the risk of catastrophic fire, therefore favoring fisher sustainability.

13   Finally, although the letter states that the project is unlikely to harm fisher populations, it

14   recommends that several additional conservation measures are taken to protect the fisher.

15           An agency may comply with its NEPA obligation to take a "hard look" by relying on

16   the expertise of other agencies.  See Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d

17   517, 529 (9th Cir. 1994).  Here, however, the Fish and Wildlife letter suffers from

18   deficiencies that are similar to the Forest Service's SIR.  While the letter deals with

19   important issues raised after 1999, and may be useful as a portion of a "hard look" analysis, it

20   was prepared on a rushed basis and lacks the careful reasoning and scientific analysis that has

21   been found to constitute a "hard look" in other cases.  See Warm Springs 621 F.2d 15 1024

22   (in this context, the court examines "the degree of care with which the agency considered the

23   information and evaluated its impact"); Laguna Greenbelt, 42 F.3d at 529 (agency had relied

24   on reports prepared by private consultants and two other agencies, including a "Biological

25   Opinion" prepared by the Fish and Wildlife Service).  The Fish and Wildlife analysis does

26   not seriously address the biological importance of the southern Sierra fisher given the

27   agency's own prior finding of genetic distinctiveness.  Given this and the other findings that

28   the fisher is isolated and suffers from low population numbers, the letter does not

appropriately analyze the importance of individual fishers. By relying mainly on the fact that only a small portion of high-quality fisher habitat will be thinned, the letter appears to adopt the same assumptions as the original EA: that the loss of individual fishers is acceptable since enough important habitat remains, or that the current fisher population can be sustained with 8% less high-quality habitat. Yet, this seems to contradict the finding made in the earlier, more thorough, analysis that listing is warranted. It also is unsupported by a reasoned analysis of how much high-quality habitat may be lost or how many individual fishers may be lost before the trend towards extinction becomes irreversible.

The letter's reliance on protecting fishers from fire also fails to conduct the proper analysis. There can be little dispute that fire poses a threat to the fisher and must be considered in an environmental analysis. However, the proper question given all the available science is not only whether a project protects the Forest from catastrophic fire, but also whether it does so in a manner that has the least impact on sensitive species. For example, a reasoned analysis likely would revisit the original canopy cover and tree diameter restrictions to determine--in light of all the new information--whether restrictions set at other levels would still protect the forest from fire while better protecting important habitat features.

Finally, it is doubtful that the Fish and Wildlife letter by itself can satisfy the Forest Service's "hard look" obligations since the Service has not examined whether the further "Conservation Recommendations" made by Fish and Wildlife should be implemented. A proper "hard look" would likely contain an evaluation of whether these measures are necessary to offset whatever impacts the Saddle project may have.

In summary, the Court finds that serious questions remain regarding whether the Forest Service has engaged in, and properly documented, the appropriate hard-look analysis. The Court does not here find that the reasons given by the Forest Service for dismissing the new information are arbitrary or capricious. Instead, the Court finds that the Forest Service has not yet provided a thorough, detailed and reasoned analysis of how the specific

14

1   information identified by plaintiffs changes or does not change the Forest Service's finding

2   in 1999 that the Saddle project will have no substantial impact on the pacific fisher.

3           **B.  Cumulative Effects**

4           In addition to the new biological data that has emerged regarding the fisher, plaintiffs

5   also cite three new logging projects in the vicinity of the Saddle project that were not

6   considered in the original BE or EA.  The three contracts, called the Ice Helicopter Sale,

7   White River Timber Sale and Frog Timber Sale, are approved but have not yet begun.  Under

8   NEPA, the Forest Service must not only consider the impact of an individual project on the

9   environment, but must also consider the cumulative impact the project would have when

10  viewed along with other projects.  See Save the Yaak Comm. v. Block, 840 F.2d 714, 720

11  (9th Cir. 1988).

12          The 1999 BE contained no analysis of how these projects would impact the fisher.

13  While the BE did take up the issue of cumulative effects, it stated that "[o]ther foreseeable

14  timber harvest actions likely in the next 1-2 years include a portion of the Roadside Hazard

15  and Safety Hazard Removal Projects."  BE at 14; EA at 33.  The report noted that these

16  projects would only result in the removal of 1.5 MMBF, and would be confined to areas

17  other than prime habitat locations.  Id.

18          Intervenor contends that the Sierra Club cannot now raise the Ice sale as new

19  information because information regarding that project was available in 1999, when plaintiffs

20  had the opportunity to challenge the initial environmental review of the Saddle project.

21  However, "[c]ompliance with NEPA is a primary duty of every federal agency; fulfillment of

22  this vital responsibility should not depend on the vigilance and limited resources of

23  environmental plaintiffs."  Friends of Clearwater v. Dombeck, 222 F.3d 552, 559 (9th Cir.

24  2000) (quoting City of Davis v. Coleman, 521 F.2d 661, 667 (9th Cir. 1975)).  Whatever the

25  status of the Ice sale in 1999, it was not mentioned or contemplated by the BE, and therefore

26  constitutes new information that the Service was required to analyze in determining whether

27  a SEIS was necessary.  See Friends of Clearwater, 222 F.3d at 559.

28

1    Intervenor also contends that the Sawmill project has no impact because it is 10-15

2    miles from the Saddle project area.  However, this argument misses the point for several

3    reasons.  First, there is substantial evidence that fishers occupy large home ranges over their

4    life spans and that the fisher population stretches in a thin band, from north to south, along

5    the western slope of the Sierra Nevada.  The Sawmill project, when considered together with

6    the other three projects, appears to narrow that band and thus perhaps runs the risk of further

7    fragmenting or isolating the fisher.  Second, and more importantly, the Forest Service has not

8    taken a "hard look" in light of all of the new information at what the proper analysis area

9    should be.

10    Intervenor also contends that the EA or EIR that will be prepared for the Sawmill

11    project will satisfy NEPA's requirement that the Forest Service consider cumulative impacts.

12    While it is legally correct that the Sawmill project's environmental review could extinguish

13    the Service's obligation to take account of cumulative impacts for the Saddle project, see

14    Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th Cir. 1998), no EIR or EA has

15    yet been prepared.  The Ninth Circuit has held, reasonably, that a cumulative effects analysis

16    "need be done in only one of the studies."  Here, it has not yet been done in any study.  See

17    id. (finding that because the later timber sale's EA made a finding of no significant impacts

18    in conjunction with the earlier sale, no supplemental EA or EIS was needed).

19    Finally, defendants rely again on the August 2005 Fish and Wildlife letter, which

20    states that it has taken account of cumulative effects.  The Court once again notes, however,

21    that the letter was prepared in a rushed fashion and therefore the value of its scientific

22    analysis is called into question.  Further, while it is true that the Court should defer to an

23    agency's determination regarding the scope of a cumulative impacts analysis, see Selkirk

24    Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003), Anderson admitted at

25    the hearing that the geographic scope of Fish and Wildlife's cumulative impacts analysis was

26    chosen based solely on his direction, and that he chose the range to be considered based

27    solely on the projects plaintiffs had raised in their earlier briefs.  That the scope of

28    cumulative impacts was determined in this manner challenges defendants' claim that it was

based on the agency's expertise. The proper scope should be the result of reasoned analysis based on science, not on an attempt to refute an argument in litigation. Using science, the Forest Service may determine that the proper scope is much smaller or much larger than that considered by the Fish and Wildlife letter. Assuming that the agency's expertise governs that determination, the Court would defer to that judgment.

In summary, serious questions remain regarding cumulative impacts.

## II. Balance of Hardships

Timber cutting that has an environmental impact always has a strong potential of causing irreparable harm justifying preliminary relief. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 544 (1987) (stating that, although there is no presumption of irreparable harm from environmental degradation, such injuries are often not compensable by money damages and can be irreparable). The Ninth Circuit has reviewed several injunction motions regarding timber cutting and has often found that it fulfills the irreparable injury requirement. Earth Island Institute v. United States Forest Service, 351 F.3d 1291, 1299 (9th Cir. 2003). The court has stated that the question ultimately turns on the likelihood of the purported injury occurring. See id. (finding that district court applied the wrong legal standard where it looked for "actual harm" or a "concrete probability of irreparable harm" and did not assess the plaintiff's arguments that there was some likelihood of harm). Here, plaintiffs have presented evidence from Dr. Barrett that the fisher is on a trend towards extinction and that losses of individual fishers could have devastating consequences. In addition, all parties agree that the fisher is a highly habitat specific animal that could be impacted by alterations to its environment.

Defendants claim that plaintiffs delay in bringing this motion undercuts, if not disposes, of their assertions of irreparable harm. However, plaintiffs state that they only became aware of the plan to initiate the Saddle contract weeks before their motion was filed. Further, defendants have at other stages of this litigation insisted that plaintiffs would have to wait until the specific go-ahead to begin cutting occurred before there was the final agency

action that is a prerequisite to a NEPA claim.  Nor does plaintiffs' delay in any way minimize the environmental damage that plaintiffs contend could occur.

Intervenors argue for a $250,000 bond in order to make up for the 50 jobs they say will be lost if an injunction is ordered.  In so arguing, they appear to be assuming that the Court will enjoin all of their current timber contracts.  However, only the Saddle contract is before the Court and only the losses due to an injunction on that sale should be considered. Assuming the Court enters a temporary injunction that is not upheld on summary judgment, then the harm to intervenors will be that they will have to wait until the Court rules on a summary judgment motion before they can begin timber cutting.  At worst, this may force them to wait until next year, after the fisher's mating season.  However, intervenors' claims that delay will cause losses is undermined by the fact that they have waited five years to execute this contract because of unfavorable timber prices.  Therefore, depending on the price of timber, a wait of one year may even benefit the intervenors.  At bottom, while intervenors may be correct that delay in initiation of the Saddle contract might cause them temporary losses, they have not demonstrated that such losses will not later be recovered if and when the project finally commences.

Considering the various interests involved, the Court concludes that a bond of the size desired by intervenors is not justified.  However, the Court finds that the $5,000 bond already posted by the plaintiffs after the TRO was initially entered should remain posted.

## CONCLUSION

Balancing the serious environmental harms which could occur absent preliminary relief with the serious questions that remain as to the merits, the Court finds that a preliminary injunction is warranted.  Therefore, the Court hereby GRANTS plaintiffs' motion for a preliminary injunction.  Defendants and intervenors to this action, and their contractors, are hereby enjoined from taking any further action to implement the Saddle Fuels Reduction Project within the Giant Sequoia National Monument and Sequoia National Forest, including permitting, commencing or continuing any timbering activities such as the

1  cutting, logging, or removal of trees or logs from any part of the project area.  This injunction

2  shall remain in effect until it is altered or discharged by a further order of this Court.

3      **IT IS SO ORDERED.**

4

5  Dated: September 9, 2005          CHARLES  R. BREYER
                                     UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28