1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  SIERRA CLUB et al.,                    No. C 05-00397 CRB

12              Plaintiffs,                 Related Case No. C 05-00898 CRB

13      v.                                  Related Case No. C 04-02588 CRB

14  DALE BOSWORTH et al,                    **MEMORANDUM AND ORDER**

15              Defendants.
                                  _____/

16

17         Now before the Court is a motion for preliminary injunction filed by several

18  environmental groups asking the Court to temporarily halt the execution of a logging contract

19  in the southern Sierra Nevada Mountains.  On September 9, 2005, the Court issued a

20  preliminary injunction temporarily stopping a different yet similar logging project because of

21  uncertainty about its potential impact on the habitat of the Pacific fisher, a mink-like animal

22  that may be facing extirpation in that area.  See Sierra Club v. Bosworth, 2005 WL 2204986

23  (N.D. Cal. Sep 09, 2005) (NO. C 05-00397 CRB) ("Saddle Order").   The Court now

24  addresses the application of the same concerns expressed in the Saddle Order to a different

25  contract in the same region.  After carefully considering the record in this matter, and with

26  the benefit of an extended hearing which included live testimony, the Court hereby GRANTS

27  the motion for a preliminary injunction.

28  //

**PROCEDURAL HISTORY**

Plaintiffs, a consortium of environmental groups, file this motion for a preliminary injunction of the Ice Timber Sale ("Ice Project") and request the Court to suspend defendant-intervenor Sierra Forest Project's logging operations related to this project until the merits of the case can be decided. The Ice Project, which covers 1,160 acres within and around the Giant Sequoia National Monument, includes units subject to environmental reviews in both the Revised Ice Timber Sale and Fuels Reduction Project Environmental Assessment ("Ice EA") and the Revised White River Environmental Assessment ("White River EA"). The Ice EA was released on September 11, 1998 and a decision notice and finding of no significant impact ("Ice DN/FONSI") was completed on December 11, 1998. Def. Opp. at 7. The White River EA was published in July 1997 and was authorized by the November 14, 1997 decision notice and finding of no significant impact ("White River DN/FONSI"). Id. Both DN/FONSIs incorporated the findings of separate Biological Evaluations ("BEs") on sensitive species in the region, including the fisher. The original EAs for all projects (Ice, White River and Saddle) generally rely on the same information, most important of which is the 1993 California Spotted Owl Interim Guidelines ("CASPO"), which were implemented to preserve the habitat of the spotted owl and are thought to apply to the fisher, as well. Among other things, the original environmental analyses concluded that the relevant logging projects "may affect individual[s] fisher, but are not likely to "result in a trend toward federal listing or loss of viability" of the Pacific fisher. See Ice EA at *59. The Forest Service concluded that an Environmental Impact Statement ("EIS") was not necessary because the impact of the Ice Project on "plant and animal habitat" would be "beneficial, but not significant." Def. Opp at 1.

On November 15, 1999, the Ice contract was awarded to intervenor. In 2001 and 2004, amendments to the Sierra Nevada Forest Plan ("SNFPAs") were passed. A review of the consistency of the 2001 SNFPA with the Ice Project was released on June 14, 2001 and found that the CASPO Interim Guidelines were not called into question by the 2001 SNFPA.

There was no review of the 2004 SNFPA until a Supplemental Information Report dated August 29, 2005 ("August 29 SIR").

Although the Ice Project contract was initially slated to be completed by March 31, 2004, its termination date was extended twice by statute because of the low price of timber and then two more times for other reasons. On August 31, 2005, intervenor moved its equipment from the Saddle Project to the Ice Project and commenced logging. On September 9, the Court issued a preliminary injunction suspending the Saddle Fuels Reduction Project ("Saddle Project") because the United States Forest Service ("Forest Service" or "Service") had failed to conduct a 'hard look' at the environmental impact of a project as required by the National Environmental Policy Act ("NEPA") when significant new information emerges. There, the Court determined that serious questions remained as to whether the Forest Service properly performed the requisite environmental analysis of new information regarding the project's effect on the Pacific fisher, and that balancing the potential for serious environmental harms with the financial harm from delay tipped in favor of plaintiffs. On October 18, 2005, plaintiffs filed this motion to preliminarily enjoin the Ice Project. Then, "in light of the Court's ruling on September 9, 2005," defendants submitted more thorough SIRs dated October 26, 2005, the same day they submitted their Opposition. The October SIRs purport to satisfy the Forest Service's obligation under NEPA to conduct a proper 'hard look' at the Ice Project's environmental impact on the Pacific fisher. On November 4, the Court heard extensive oral argument from all parties.

## BACKGROUND

Plaintiffs contend that the new information that has emerged on the fisher since the contracts were awarded in 1999 is 'significant' such that it triggers a requirement to conduct a NEPA-authorized supplemental review. Pl. Reply at *3. Plaintiffs assert that, like the Saddle Project, defendants 1) have failed to take a 'hard look' at new information in order to reassess its previous conclusions that the Project would have "no significant impact" on the fisher, and 2) have failed to assess the cumulative effects of all of the logging projects in the region: the Saddle, Ice, White River and Frog projects. Pl. Mot. at *3. Moreover, plaintiffs

argue that the October SIRs are "facially deficient" because they are akin to litigation affidavits. Pl. Reply at *3. In addition, plaintiffs contend that the SIRs are further deficient because the habitat analysis conflicts with that of the original NEPA documents without explanation, and the cumulative effects analysis fails to adequately explain how the impacts are insignificant. Id. at *6-8. Finally, plaintiffs argue that the balance of hardships tips in their favor because environmental injury cannot be repaired in the same manner that economic injury can. Id. at *8-10.

Defendants counter that the new information is not significant and that the October SIRs adequately conducted a 'hard look.' The SIRs conclude that, like the original FONSI, additional NEPA review is not necessary because a reduction in the threat of wildfire results will yield an insignificant yet beneficial impact on the fisher. Def. Opp. at *2. They also argue that the importance of the project is underscored by the proximity of the logging areas to residential communities and the added importance of avoiding wildfires (as distinguished from the Saddle Project, which was not located as close to residential areas). Id. Finally, defendants argue that the October 26 SIRs properly evaluate the cumulative effects of all the logging projects on the Southern Sierra fisher sub-population and determined that the analysis of the new information is consistent with the original analysis.

In addition, defendant-intervenor argues that the Ice Project is distinct from the Saddle Project in important ways not mentioned in defendants' brief. First, the Project has already been awarded. This, in comparison to projects that have merely been proposed, prompts a different, more stringent standard in evaluating whether a preliminary injunction is appropriate because it alters the hardship analysis. Intv. Opp. at *6. Second, the project is an integral part to a larger fuels reduction initiative in the region, which has already started. Id. at *4-5. As a result, intervenor argues that it is in the public interest to reduce the threat of catastrophic wildfire. Id. Third, intervenor and its employees will suffer considerable financial harm if the injunction is granted. Id. at *5-6. Finally, intervenors argue that, unlike the Saddle Project which had no record of the size of trees to be removed, the Ice Project maintains such a record because it has already commenced. This record reveals that less than

1 percent of 9,000 logs are greater than 22 inches in diameter. <u>Id.</u> at *3. Since fishers'
preferred habitat consists of larger trees, intervenor argues, the effect on the fisher will be
minimal.

**STANDARD OF REVIEW**

**I.      Preliminary Injunction**

The traditional criteria for granting preliminary relief are: 1) a likelihood of success on
the merits, 2) the possibility of irreparable injury, 3) a balance of hardships favoring the
plaintiff, and 4) that the preliminary relief be in the public interest. <u>See</u> <u>Barahona-Gomez v.
Reno</u>, 167 F.3d 1228 (9th Cir. 1999). This test has evolved into the modern standard that the
plaintiff must "demonstrate either (1) a combination of probable success on the merits and
the possibility of irreparable injury if relief is not granted, or (2) the existence of serious
questions going to the merits and that the balance of hardships tips sharply in its favor." <u>First
Brands Corp. v. Fred Meyer, Inc.</u>, 809 F.2d 1378, 1381 (9th Cir. 1987). While this test is
phrased in the disjunctive, many courts view it as essentially a single test. Viewed as a single
test, the greater the showing of likely success the lighter the burden in terms of the relative
hardship, and vice versa. <u>See</u> <u>Regents of Univ. of Calif. v. ABC, Inc.</u>, 747 F.2d 511, 515
(9th Cir. 1984).

**II.      NEPA**

The National Environmental Policy Act of 1969 ("NEPA") is a procedural statute
designed to ensure that federal agencies taking major actions affecting the quality of the
human environment "will not act on incomplete information, only to regret its decision after
it is too late." <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 371 (1989). A
federal agency has a continuing duty to gather and evaluate new information relevant to the
environmental impact of its actions and then "make a reasoned determination whether it is of
such significance as to require implementation of formal NEPA filing procedures." <u>Warm
Springs Dam Task Force v. Gribble</u>, 621 F.2d 1017, 1023, 1024 (9th Cir. 1980). The Ninth
Circuit has held that an Environmental Impact Statement ("EIS") "*must* be prepared if
substantial questions are raised as to whether a project ... *may* cause significant degradation

of some environmental factor." <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1149 (9th Cir. 1998) (citations omitted) (emphasis in original). Yet a plaintiff need not show that "significant effects *will in fact occur*;" rather, merely raising "substantial questions whether a project may have a significant effect is sufficient." <u>Id.</u> at 1150 (emphasis added). The inquiry whether to conduct a supplemental NEPA analysis and an initial analysis is the same: "If there remains major federal action to occur, and if the new information is sufficient to show that the remaining action will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS [or EA] must be prepared." <u>Friends of the Clearwater v. Dombeck</u>, 222 F.3d 552, 558-558 (9th Cir. 2000) (citing <u>Marsh</u>, 490 U.S. at 374).[1] A proper evaluation under NEPA must also include an analysis of the cumulative effects of the individual project and others like it. <u>See</u> <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1214 (9th Cir. 1998) (holding that a determination whether a project has a 'significant' impact on the environment must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts") (quoting 40 C.F.R. § 1508.27(b)(7))).

The Court must determine whether the Forest Service adequately satisfied its duty under NEPA; it must not substitute its own judgment for that of the agency. <u>See</u> <u>Friend of the Clearwater</u>, 222 F.3d at 556. The Court may conclude that a proper 'hard look' was not conducted only if the agency's analysis is "arbitrary and capricious or contrary to the procedures required by law." <u>Inland Empire Public Lands Council v. United States Forest Service</u>, 88 F.3d 754, 763 (9th Cir. 1996). This amounts to a two-part inquiry: First, a challenge to the facial adequacy of a NEPA review requires a court to employ a 'rule of reason' to determine whether the review contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." <u>Neighbors of Cuddy Mountain. v. United States Forest Service</u>, 137 F.3d 1372, 1376 (9th Cir. 1998) (citations omitted); <u>see</u>

---

[1] There is no dispute here that the Ice Project and the similar logging projects in the region are "major federal actions." <u>Cf.</u> <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 72-73 (2004).

also <u>Save the Yaak Comm. v. Block</u>, 840 F.2d 714, 717 (9th Cir. 1988) (holding that "agency

action taken without observance of the procedure required by law will be set aside").

Second, if the environmental review satisfies the initial facial challenge, the reviewing

court must determine whether the analysis therein satisfies the proper standard under NEPA.

The Ninth Circuit has held that analyses of primarily legal questions – such as the legal

meaning of 'significance' – are governed by a standard of 'reasonableness.' <u>See Northcoast</u>

<u>Envtl. Ctr. v. Glickman</u>, 136 F.3d 660, 667 (9th Cir. 1998) (holding that "the less deferential

standard of 'reasonableness' applies to threshold agency decisions that certain activities are

not subject to NEPA's procedures"). A review of factual disputes, however, requires the

application of the 'arbitrary and capricious' standard. <u>Id.</u> (citing <u>Greenpeace Action v.</u>

<u>Franklin</u>, 14 F.3d 1324, 1331 (9th Cir. 1992). In practice, however, this distinction is

immaterial. <u>See</u> <u>Thomas</u>, 137 F.3d at 1149 (noting that courts have held that the arbitrary

and capricious and reasonableness standards under NEPA do not materially differ).

## QUESTION PRESENTED

The Court is not concerned here with whether the original environmental evaluations

and FONSI regarding the Ice Project properly satisfied NEPA. The Court's analysis centers

on whether plaintiffs have raised serious questions regarding their claim that the Service has

not conducted a proper 'hard look' at information that has been discovered or published on

the Pacific fisher *since* the Ice Project was approved and awarded to intervenor. In its Saddle

Order, the Court determined that plaintiffs had met their burden of raising serious questions

as to the existence of new information about the Pacific fisher that required a "hard look"

under NEPA. Because the same underlying claim is at issue here as in the Saddle Order --

that the Service did not conduct a proper NEPA analysis of new information on the viability

of the Pacific fisher in the Southern Sierra Nevada Mountains -- the Court hereby adopts its

reasoning and analysis in the Saddle Order pertaining to the existence of new information on

the fisher. <u>See</u> Saddle Order at *6-10. That finding triggers a duty under NEPA for the

Forest Service to conduct a 'hard look' at the new information to determine if it is

significant, which would then require a supplemental EA or EIS. To that end, all parties agreed in open court that the narrow issue before the Court is to determine whether the two Supplemental Information Reports ("SIR") dated October 26, 2005, satisfy the federal government's duty under NEPA to conduct such a 'hard look.' In sum, the Court's inquiry is twofold: (1) as a threshold matter, are there serious questions as to whether the October SIRs are in "observance of the procedures required by law?"; and if so, (2) should the Service's decision not to conduct a supplemental EA or EIS be set aside as arbitrary and capricious or unreasonable?

**DISCUSSION**

**I.     Likelihood of Success on the Merits**

**1.     Validity of October 26 SIRs**

The Service argues that, upon the direction of the Court in its Saddle Order, it conducted an appropriate review of the environmental impacts of the Ice Project on the Pacific fisher and found that no significant impact exists. The October SIRs purports to analyze "information available subsequent to [the decision] to implement the [Revised Ice EA]." October Ice SIR at *1.[2] The evaluation determined that "because there is negligible change in analysis of effect on the fisher, no new or supplemental NEPA analysis is required and[] the original decision is affirmed." Id.

Plaintiffs argue that the October SIRs are essentially litigation affidavits that were prepared after logging commenced. Pl. Reply at 3 n.2. Plaintiffs contend that they "facially lack the objectivity that would warrant this Court's deference." Id. at 3. Further, plaintiffs argue that "no agency has prepared an in-depth, revised biological evaluation that takes a detailed look at the fisher's current status and the ramifications of short-term habitat degradation." Id. Plaintiffs allege that findings in the October Ice SIR, largely based on an unpublished 2001 study made for intervenor, contradict the Ice BE in a manner that the Court

_____

[2]Because the two October 26 SIRs are very similar, the Court relies primarily on the Ice SIR since it is more extensive and directly related to the Ice Project.

deemed unsatisfactory in the Saddle Order.  Id. at 4-5.  To that end, the Ice SIR also fails to analyze the short-term effect on the fisher, relying instead on long-term rehabilitation of the area.  Plaintiffs also argue that the October SIR has developed new theories for optimal fisher habitats that do not have the proper scientific underpinnings.  In sum, plaintiffs contend that this latest round of SIRs do not amount to a proper 'hard look.'

Three aspects of the October SIR require close scrutiny: (1) whether under these circumstances, a SIR is sufficient to satisfy NEPA; (2) that it was evidently written in six weeks in direct response to the Saddle Order as part of the Opposition to plaintiffs' motion; and, most importantly, (3) the fact that it was prepared *after* the Ice Project had commenced.[3]

Supplemental Information Reports are the Forest Service's formal instruments for documenting whether new information is sufficiently significant to trigger the need for a supplemental EIS ("SEIS").  See Friends of the Clearwater, 222 F.3d at 555 (citing Forest Service Handbook 1909.15 § 18.1).  Although SIRs are not mentioned in NEPA or in the regulations implementing NEPA, "courts nonetheless have recognized a limited role within NEPA's procedural framework for SIRs."  Idaho Sporting Congress v. Alexander, 222 F.3d 562, 565, 566 (9th Cir. 2000).  In particular, courts have condoned the use of SIRs for the specific purpose proffered here by defendants: to determine whether new information or changed circumstances require a supplemental EA or EIS.  See id. at 566 n. 3 (noting that a SIR "is the appropriate means by which to make an initial evaluation of the significance" of new information); see also Price Rd. Neighborhood Ass'n v. United States Dep't of Transportation, 113 F.3d 1505, 1508-09 (9th Cir. 1997) (explaining that a supplemental EA is required if the environmental impacts of changed circumstances "are significant or uncertain").  The Supreme Court has found that a SIR satisfies an agency's NEPA obligations where the SIR demonstrates that the agency had "determined based on careful scientific analysis that the new information was of exaggerated importance," therefore

_____

[3]It is not necessary to address plaintiffs' arguments about the factual underpinnings of the October 26 SIRs since the Court is only concerned here with their facial validity.

9

indicating that the agency had "conducted a reasoned evaluation of the relevant information...." <u>Marsh</u>, 490 U.S. at 378.

The Court is skeptical about the feasibility of satisfying this standard in a little more than one month's time, as the Forest Service purports to do. NEPA sets out strict criteria that federal agencies must satisfy when analyzing new information to determine its significance. <u>See</u> <u>Thomas</u>, 137 F.3d at 1151 ("Accurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA.") (quoting 40 C.F.R. § 1500.1(b)) (emphasis in original). Although SIRs, with their more relaxed criteria, have been upheld as appropriate in situations similar to this, they should not be approved where they do not properly satisfy the fundamental objectives and requirements of NEPA. At the very least, a careful scientific analysis would likely entail more than a cursory evaluation of a sprinkling of the recent publications on topic, and would include some explanation for a conclusion that directly conflicts with that of the expert federal agency in this area. <u>See</u> "Endangered and Threatened Wildlife and Plants; 12-month Finding for a Petition to List the West Coast Distinct Population Segment of the Fisher," 69 Fed. Reg. 18770, 18790 (April 8, 2004) ("FWS Finding") (finding that the southern Sierra Pacific fisher is in danger of extirpation); <u>see also</u> <u>Cuddy Mountain</u>, 137 F.3d at 1379 (noting that a NEPA review requires "some quantified or detailed information"). As a result, the Court is not satisfied that the October SIR amounts to a "careful scientific analysis" of the new information on the Pacific fisher.

Second, the Ninth Circuit has determined that an agency can rectify a violation of NEPA by conducting an appropriate analysis while the case is still pending. <u>See</u> <u>Friends of the Clearwater</u>, 222 F.3d at 560-561 (9th Cir. 2000) (holding that an injunction was inappropriate because the Forest Service remedied their failure to satisfy NEPA). In <u>Friends of the Clearwater</u>, however, the Forest Service prepared several documents after the inception of litigation: "a new SIR, several Biological Assessments and Biological Evaluations, and other documents, all of which contained additional data and analyses...." <u>Id.</u> at 561. Furthermore, in <u>Warm Springs</u>, beginning one month after trial, the federal agency

conducted a 10-month study that was then reviewed by independent experts and the state of California before determining that supplemental environmental evaluations were unnecessary. See Warm Springs, 621 F.2d at 1025-1026. Here, the Court notes obvious distinctions between the SIRs submitted in this case and the documents and analysis conducted in Warm Springs and Friends of the Clearwater. After the Court determined in the Saddle Order that the Forest Service had not conducted a proper hard look, the Service submitted two very similar SIRs a mere six weeks later that appear to incorporate sections of previous declarations and even portions of the original NEPA documents. The submission's lack of thoroughness and reasoning does not satisfy this Circuit's precedent, as it does not amount to a proper level of review that has been approved in other cases.

Finally, and most importantly, the SIR documents purportedly were created after the Saddle Order. See October Ice SIR at *2 ("This SIR attempts to address the Court's concerns in the Saddle Decision."). Yet intervenor testified in open court that logging commenced on August 31, 2005. The Ninth Circuit has held that NEPA evaluations must be prepared "early enough" so that they "will not be used to rationalize or justify decisions already made." Save the Yaak, 840 F.2d at 718; see also Alexander, 222 F.3d at 568 (defining "early enough" to mean "at the earliest possible time to insure that planning and decisions reflect the environmental values"). In Save the Yaak, for example, the court held that the Forest Service violated NEPA's timing requirement by preparing EAs for a road building project after the project had already begun. 840 F.2d at 718-719. This case falls squarely under this precedent, as the October SIR was prepared after the project had begun and is therefore susceptible to improper incentives to "rationalize or justify" the decision not to conduct a supplemental EA or EIS. As a result, the Court finds that the Forest Service violated the timing requirement of NEPA.

The Court acknowledges that the Ninth Circuit has upheld SIRs as satisfactory NEPA evaluations in this context, and that proper NEPA evaluations conducted during the pendency of litigation have been approved. But in the totality, where the Service rushed the creation of

two SIRs in order to oppose a motion for preliminary injunction while the project moves forward, plaintiffs have raised serious questions as to whether the Service has acted "contrary to the procedures required by law" and has failed to conduct a proper 'hard look' at the new information on the Pacific fisher.

### 2. Analysis of the SIRs

If the October SIR does satisfy NEPA's 'hard look' requirement, then the Court must defer to the agency's decision if is "fully informed and well considered." Blue Mountains, 161 F.3d at 1211.[4]  The Supreme Court has held that in this context, courts should not automatically defer to the agency without careful scrutiny to ensure "that the agency has made a reasoned decision based on its evaluation of the significance -- or lack of significance -- of the new information." Marsh, 490 U.S. at 378.  The reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (citations omitted). Relevant factors include:

> 1) the environmental significance of the new information; (2) the probable accuracy of the information; (3) the degree of care with which the agency considered the information and evaluated its impact; and (4) the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

Warm Springs, 621 F.2d at 1024.  If the relevant new information raises "substantial questions whether a project may have a significant effect" on the fisher, plaintiffs have met their burden of showing that serious questions exist whether the Forest Service conducted a proper hard look. See Thomas, 137 F.3d at 1150.

### A. New Information

In the Saddle Order, the Court determined that new information had been discovered in the six years since the Ice Project was approved.  The Court noted that academic studies

---

[4]The Court refrains here from analyzing the factual disputes at issue regarding the SIRs. Although Ninth Circuit law indicates that a pure legal analysis – such as the legal meaning of 'significance' at issue here – should warrant a review under a 'reasonableness' standard, the Court nevertheless adopts the more deferential 'arbitrary and capricious' standard because of some confusion in this Circuit's precedent.  As noted above, however, the distinction is merely incidental.

and the thorough FWS Finding called into question some of the Forest Service's assumptions and conclusions found in the original NEPA documents. In particular, the new information appeared to show that: 1) the Pacific fisher in the Southern Sierra Nevada Mountains is a genetically unique species; 2) there is a real danger of its extirpation due to dwindling population numbers and increased isolation such that Fish and Wildlife recommended listing it as endangered but lacked the resources to do so due to other higher listing priorities; 3) the effect of the Saddle Project on a few individual fishers may actually have a significant impact on the viability of the species; and 4) new information indicates that the fisher's ideal habitat may be dramatically different than that identified in the BE and its incorporating documents. See Saddle Order at *6-10. The October SIR attempts to evaluate this new information, and the Forest Service determined that its evaluation supported the findings of the original NEPA documents. As a result, the SIR concludes, "[B]ecause there is negligible change in analysis of effect on the fisher, no new or supplemental NEPA analysis is required and, [sic] the original decision is affirmed." October Ice SIR at *1. Notably, however, there is no mention in the SIR whether the new information is 'significant;' rather, the Forest Service merely asserts that the "impacts on the fisher are beneficial but not significant." Def. Opp. at *19.

## B. Significance

The central concern of the Court's analysis is not whether the new information supports the Forest Service's original conclusions, or whether the effect of the project on the fisher is more likely to lead toward listing, but whether there are "*significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Friends of the Clearwater, 222 F.3d at 557 (emphasis added). If so, NEPA requires the agency to conduct a supplemental environmental analysis. Id.; see also Marsh, 490 U.S. at 374. Regulations promulgated pursuant to NEPA by the Council on Environmental Quality ("CEQ") define 'significantly' as "requir[ing] considerations of both context and intensity." Friends of the Clearwater, 222 F.3d at 557 n.4 (quoting 40 C.F.R. § 1508.27). Context means that "the significance of an action must be

analyzed in several contexts," including both site-specific, regional and national.  Id.

Intensity "refers to the severity of the impact," and, in relevant part, the following factors should be considered:

> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; and (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

Id.

### (1) Highly Controversial

The Ninth Circuit has defined the term 'controversial' to refer "to cases where a substantial dispute exists as to the size, nature, or effect of the major Federal action rather than to the existence of opposition to a use." Sierra Club v. United States Forest Service, 843 F.3d 1190, 1193 (9th Cir. 1988).  In that case, the Sierra Club introduced affidavits and testimony of experts in the field who disputed the Forest Service's conclusion that there would be no significant effects from logging.  The court then explained, "This is precisely the type of 'controversial' action for which an EIS must be prepared."  Id.

Here, plaintiffs have presented declarations, affidavits, testimony and other evidence that vigorously attacks the Forest Service's conclusion that the Ice Project "may affect individual fisher but would not likely result in a trend toward federal listing or loss of viability of the fisher."  See October Ice SIR at *19.  In particular, plaintiffs point to the FWS Finding which found that the southern Sierra Pacific fisher is genetically distinct from other fisher, and that it meets the criteria to be placed on the endangered species list but could not be listed at the time because of higher priority listings.  See FWS Finding at 18777, 18791. In addition, the FWS Finding stated: "Fuels reduction treatments, including thinning and the removal of down woody debris, dense understory, snags, and low overstory tree crowns may *significantly affect fishers* in the immediate area."  FWS Finding at 18779 (emphasis added). Notably, the SIR does not address or confront these conclusions, even though the Fish and

Wildlife Service deserves significant deference as the expert consulting federal agency for land-based species under the Endangered Species Act. See Gifford Pinchot Task Force v. United States Fish and Wildlife Serv., 378 F.3d 1059, 1063 n.1 (9th Cir. 1994). Rather, the government declared in open court that the SIR instead analyzes the academic publications underlying the Fish and Wildlife report. While the Court refrains from assessing the accuracy of the analysis in the SIR, it does observe that the 55-page FWS Finding mentions numerous academic studies published since 1999 that were not included in the SIR. In addition, plaintiffs proffered affidavits and testimony in the Saddle motion from Dr. Reginald Barrett that include several other recent studies and his own expert analysis, all of which directly contradict the SIR conclusions. See Saddle Order at *7 (noting Dr. Barrett's testimony that the "best science" on the fisher is a 2000 report by Lamberson et al. finding that the fisher "may face imminent extinction"). The Court does not "take sides in a battle of the experts," Native Ecosystems Council v. United States Forest Service, 2005 WL 2931893, at *9 (9th Cir. Nov. 7, 2005), but finds that plaintiffs' well-documented and well-supported arguments against the cursory analysis and conclusory assertions of the SIR satisfies this Circuit's 'highly controversial' standard under the 'significance' requirement. Cf. Blue Mountains, 161 F.3d at 1213 ("We do note that failure to discuss and consider [an independent] report's recommendations lends weight to [plaintiff's] claim that the Forest Service did not take the requisite 'hard look' at the environmental consequences....").

### (2)    Highly Uncertain

The Ninth Circuit has determined that "[t]he purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." Native Ecosystems, 2005 WL 2931893 at *5 (quoting Sierra Club, 843 F.2d at 1195). Plaintiffs note that the October SIR admits that "implementation of the proposed project is not without risk" and calls for post-project monitoring. October Ice SIR at *11; see also id. at *8 (noting that "[r]esearch literature

15

documenting habitat parameters associated with natal den sites has been limited"). The Ninth Circuit has repeatedly "warned that general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Blue Mountains, 161 F.3d at 1213; see also Cuddy Mountain, 137 F.3d at 1380. Given the abbreviated analysis on the potential effect on the fisher in the October SIR, and the Service's admissions regarding the risks of the project, the Court concludes that there are serious questions concerning the degree of certainty about the project's impact on the fisher. A proper 'hard look' would result in greater certainty about the risks involved for the fisher, particularly as they relate to the cumulative impact findings below.

## C. Cumulative Impacts

Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." Blue Mountains, 161 F.3d at 1214 (quoting 40 C.F.R. § 1508.7). Morever, when there is the potential for cumulative harm, "an assessment of connected actions is necessary *even if the impact of the proposed action is not significant.*" Save the Yaak, 840 F.2d at 720 (emphasis added).

Here, there are at least four similar logging projects within the southern Sierra Mountains that may have a cumulative effect on the fisher. The October SIR provides a one paragraph summary of the cumulative impacts analysis of the original EAs, which primarily asserts that if each individual project maintains an appropriate habitat quality such that the fisher would not be affected, then there would be "no adverse cumulative effect that would affect population viability." October Ice SIR at *18. This is plainly contrary to this Circuit's precedent. The federal agency must conduct a hard look at all of the projects in the aggregate even if the individual project does not have a significant effect.

The SIRs attempt to cure this defect by adding an analysis of the "fisher sub population in the southwestern portion of the Sequoia National Forest," where the four

16

projects are located. October Ice SIR at *18.  A Forest Service analysis reveals that this area

could "support up to 80 female fisher." Id. at 19; see also FWS Finding, 69 Fed. Reg. at

18790 ("Female survival has been shown to be the most important single demographic

parameter determining fisher population stability.").  The SIR then states: "Based on similar

analysis there could be up to 23 female fisher directly affected by all of the projects currently

approved or reasonably foreseeable."[5]  Plaintiffs have presented evidence that there may be

as few as 50 female fishers remaining in the region, see Saddle Order at *7, and the

government conceded at oral argument that it cannot accurately estimate how many female

fishers currently exist in the southern Sierra Nevadas, but that it may be as few as 50.  Even if

the cumulative area encompassing the logging projects can support up to 80 female fishers,

the potential to directly affect 23 appears to be quite a significant finding.  At the very least,

it reveals a substantial degree of uncertainty regarding the cumulative effects on the fisher of

logging in this area.  Moreover, the SIR does not include a reasoned or substantive analysis

or explanation as to why this is not a significant finding worthy of supplemental evaluation,

although they do state that anticipated impacts on individual fishers "will be documented in

supplemental reviews for each individual NEPA decision." October Ice SIR at *19.  It is

unclear to the Court how the Forest Service reconciles this statement with its ultimate

determination that no additional environmental reviews are necessary.  Nevertheless, the

Court finds that there are substantial questions remaining about the cumulative effects of the

logging projects on the Pacific fisher.

The Court issues no ruling on whether the Forest Service properly evaluated the

environmental significance of the new information or its probable accuracy.  Rather, the

Court finds that the Forest Service has failed to show the adequate degree of care in

---

[5]At oral argument, government counsel referred the Court to the author's definition of "may
affect." See October Ice SIR at *11.  There, the SIR author analogizes the application of this definition
to a fisher to that of a human being stubbing her toe. Id.  While the Court generally defers to the
expertise of the federal agency on issues of environmental and biological science, it need not do so with
regard to lay issues.  It is sufficient to merely dispute the notion that a stubbed toe and a disrupted habitat
can be properly analogized.

considering this information and evaluating its impact, and that the degree to which the agency supported its ultimate decision not to supplement its analysis lacked the proper explanation and analysis. See Warm Springs, 621 F.2d at 1024. Based on the Forest Service's failure to thoroughly consider and analyze the environmental impact of the Ice Project on the Pacific fisher in a timely, well-reasoned and fully-informed manner, the Court finds that plaintiffs have raised serious questions about the Forest Service's decision to bypass supplemental environmental reviews under NEPA.

## II.    Balance of Hardships

Timber cutting that has an environmental impact always has a strong potential of causing irreparable harm justifying preliminary relief. See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 544 (1987) (stating that, although there is no presumption of irreparable harm from environmental degradation, such injuries are often not compensable by money damages and can be irreparable). The Ninth Circuit has reviewed several injunction motions regarding timber cutting and has often found that it fulfills the irreparable injury requirement. Earth Island Institute v. United States Forest Service, 351 F.3d 1291, 1299 (9th Cir. 2003). When environmental injury is "sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." Alexander, 222 F.3d at 569 (quoting Sierra Club, 843 F.2d at 1195).

First, defendants and intervenor argue that plaintiffs' delay in filing this motion underscores the paucity of irreparable harm that would occur if an injunction is denied. They point to the fact that plaintiffs have known about the Ice Project for a long time. Def. Opp. at *16. Alternatively, they argue that plaintiffs waited more than a month before filing this motion, well after the project commenced. Id. Yet "[c]ompliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs." Friends of the Clearwater, 222 F.3d at 559 (quoting City of Davis v. Coleman, 521 F.2d 661, 667 (9th Cir. 1975)).

18

Furthermore, plaintiffs do not contend in this motion that the original NEPA documents are unsatisfactory; rather, they merely contend that the Forest Service should be required to conduct a more thorough supplemental review of the newly available information on the fisher. A five-week delay in filing this motion is reasonable, particularly considering the six-year delay that occurred before the project commenced.

Second, intervenor urges the Court to determine that the significant economic damage that would be exacted by an injunction outweighs plaintiffs' claims about the dangers to the fisher of the Ice Project. It is axiomatic that environmental damage cannot be undone, whereas economic injury can almost always be rectified. Moreover, this is not a permanent injunction. At most, intervenor would have to wait until next summer to resume its project if the Court rules in its favor at a trial on the merits. In light of the fact that intervenor has waited six years to execute the contract because of unfavorable timber prices, an additional delay of less than one year cannot be devastating. See Saddle Order at *18. Permanent damage to a sensitive species, however, may indeed be irreparable.  See Alexander, 222 F.3d at 569 (holding that a preliminary injunction was warranted to preserve the status quo when balancing financial hardship against the sufficiently likely environmental harm from logging).

Third, defendants argue that fuels treatment is of "highest priority" that "takes precedence over other forest priorities." Def. Opp. at *8. In this respect the Ice Project differs from the Saddle Project because of its proximity to residential communities and the fact that much of the project exists in wild land-urban interface (WUI) where wildfires are of utmost concern. The Forest Service asserts that the unique area poses "a serious threat to life, property, and valuable forest resources." October Ice SIR at *6. Yet if the project was urgent because of these dangers, it likely would have been regulated by 36 C.F.R. § 223.52(c)(1), which applies when "the Forest Service determines that the timber is in need of urgent removal." Cf. Decl. of Paul S. Miller at ¶ 3 (noting that the Ice Project is authorized

by 36 C.F.R. 223.52(c), which allowed a contract extension as a matter of right when a drastic reduction in wood prices occurs). Defendants' argument falls hollow given the economic factors that have driven the Ice Project to date.

In sum, the Court finds that the balance of hardships tips sharply plaintiffs' favor. Intervenor requests a bond if the Court determines to enjoin their current logging operation. But based on its testimony at oral argument, intervenor likely will be able to continue working right up until the "snow flies," which should occur soon. In addition, intervenor can continue clean-up and removal of work already completed. Therefore, the current bond of $5,000 is sufficient.

## CONCLUSION

The Court finds that plaintiffs have raised serious questions about both the facial validity of the October SIRs and the adequacy of the Forest Service's analysis. There remain substantial questions about the effect of the Ice Project on the Pacific fisher which require a more thorough, careful and well-reasoned analysis in order to satisfy NEPA. Because the balance of hardships plainly tip toward plaintiffs, the Court hereby GRANTS plaintiffs' motion for a preliminary injunction. Defendants and intervenor to this action, and their contractors, are hereby enjoined from taking any further action to implement the Ice Timber Sale within the Sequoia National Forest, including permitting, commencing or continuing any timbering activities such as the cutting or logging of trees in any part of the project area. Intervenor may remove what has already been cut or logged. This injunction shall remain in effect until it is altered or discharged by a further order of this Court.

**IT IS SO ORDERED.**

Dated: November 14, 2005

_____
CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28