IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PEOPLE OF THE STATE OF
CALIFORNIA, ex rel. BILL LOCKYER,

    Plaintiff,

    v.

UNITED STATES FOREST SERVICE, et al.,

    Defendants.
_____/

No. C 05-00898 CRB

Related Case No C 05-00397 CRB

**MEMORANDUM AND ORDER**

    This lawsuit is one of two companion cases concerning the Grand Sequoia National Monument, which was carved out of the Sequoia National Forest by presidential proclamation in 2000. Pursuant to the Proclamation, defendant United States Forest Service developed a programmatic environmental plan for the Monument. Plaintiff People of the State of California ("California") challenges the Monument Plan under the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). California makes seven claims challenging the adequacy and sufficiency of the Monument Plan: (1) failure to create a discernible and comprehensible plan in violation of the Proclamation and the APA; (2) a similar "incomprehensibility" claim under NEPA; (3) failure to comply with the plain text of the Proclamation; (4) failure to take the requisite "hard look" under NEPA at the potential environmental impact of the Plan; (5) failure to

conduct an adequate cumulative impacts analysis under NEPA; (6) improper "tiering" to the 2004 Sequoia National Forest Fire Management Plan; and (7) failure to honor the terms of a 1990 Mediated Settlement Agreement regarding the Sequoia National Forest. Now pending before the Court are consolidated cross-motions for summary judgment. After carefully considering the parties' thorough briefing, exhaustively reviewing the sizable administrative record, and with the benefit of oral argument, the Court hereby GRANTS plaintiff's motion for summary judgment and DENIES defendants' motion for summary judgment.

## BACKGROUND

### I. Factual Background

#### A. Sequoia National Forest

The Sequoia National Forest encompasses more than 11.5 million acres of land at the southern end of the Sierra Nevada mountain range. In 1988, pursuant to the National Forest Management Act ("NFMA"), the Forest Service issued its Land and Resource Management Plan ("LRMP") for the Sequoia National Forest. See 16 U.S.C. § 1604. After numerous parties, including the California Attorney General and the Sierra Club, appealed the LRMP through administrative avenues, a Mediated Settlement Agreement ("MSA") resolved outstanding issues in 1990. By its terms, the MSA applied "solely to the issues raised in administrative appeals," and limited some of the timber harvesting outlined in the LRMP. In addition, the MSA required NEPA-compliant amendments to the 1988 LRMP to incorporate its provisions. Administrative Record ("AR") 1686. Finally, the MSA "provides for its termination at such time as the Plan is revised in accordance with 36 U.S.C. section 219.10(g)." AR 1681.

In 1993, the 1988 LRMP was modified by the 1993 California Spotted Owl Sierran Province Interim Guidelines ("CASPO") and was then amended by the 2001 Sierra Nevada Framework Plan, which applied to all 11 national forests in the Sierra Nevada, including the Sequoia. Although the 2001 Framework included widespread modifications and alterations of the 1988 LRMP, all parties agree that it was not intended to incorporate the MSA. Further, the 2001 Framework expressly applied to the Grand Sequoia National Monument,

2

subject to any changes made in the Monument Plan required by the Presidential Proclamation. In 2004, the Forest Service issued a Record of Decision on another amendment to the 1988 LRMP soon after the Monument Plan was finalized.

**B.  Grand Sequoia National Monument**

On April 15, 2000, President Clinton signed Executive Proclamation 7295 establishing the Grand Sequoia National Monument ("GSNM" or "Monument"). AR 1979-1983. The Proclamation recognized the unique and extraordinary scientific and historic resources of this slice of the Sequoia National Forest, including a critical mass of the rare giant sequoia tree, unique wildlife endemic to the region because of its unusual ecosystem, and paleontological and archaeological resources. After noting the failure of sequoia trees to reproduce in the area and the increased risk of wildfire as a result of fire suppression, the Proclamation asserted that "[t]hese forests need restoration to counteract the effects of a century of fire suppression and logging." AR 1980. On the other extreme, the Proclamation identified the impact of five decades of heavy logging at the end of the 19th Century which "resulted in the virtual removal of most forest in some areas of the monument." AR 1981. The Proclamation further noted: "Outstanding opportunities exist for studying forest resilience to large-scale logging and the consequences of different approaches to forest restoration." Id.

Further, the Proclamation delegated responsibility to the Department of Agriculture, via the Forest Service, to "implement the purpose and provisions of this Proclamation" pursuant to applicable legal authorities. AR 1982. It mandated that, within three years of the effective date, the Forest Service prepare a management plan for the monument and promulgate appropriate regulations for its management. Id. "The plan will provide for and encourage continued public and recreational access and use consistent with the purposes of the monument." Id. The Forest Service was instructed to appoint a Scientific Advisory Board to provide scientific guidance during the development of the initial management plan. Id.

//

### C. Monument Management Plan

In January 2004, the Forest Service issued the Grand Sequoia National Monument Management Plan Record of Decision ("Plan ROD") which further amended the 1988 LRMP. The Plan adopted Modified Alternative 6 of the Final Environmental Impact Statement ("FEIS"), which was approved in December 2003. The Draft Environmental Impact Statement ("DEIS") was noticed to the public in December 2002, and the Forest Service received more than 16,000 comments. AR 14374. The Forest Service recognized that the Plan "is not presented concisely nor in one document or location;" rather, the Plan "includes a considerable overlay of direction from both the 1988 [LRMP] and the 2001 [Framework], where that direction is consistent with the intent of the Proclamation and appropriately suited to the strategy informing Modified Alternative 6." AR 18575.

### D. Modified Alternative 6

The FEIS included "six alternatives designed to manage the giant sequoias and other objects of interest." AR 13823. The FEIS notes that Modified Alternative 6 "will amend the current [1988 LRMP], as previously amended by the [2001 Framework]." Id. The FEIS stated that based on the Proclamation and the work of the SAB, the benchmark for management strategies centered on pre-1875 conditions. AR 13830. "The structural conditions, and timing, intensity, and frequency of processes that existed prior to 1875 will be used as reference conditions." Id. The FEIS emphasized that, "[i]n the long term, [prescribed] fire will be the primary management tool for maintaining and sustaining ecosystems, although mechanical treatments will be used in some instances." Id.. Under pre-1875 conditions, "fires will generally be low intensity and occur frequently across the landscape...." AR 13831.

Although "Modified Alternative 6 emphasizes prescribed fire as the preferred treatment method to reach ecological restoration and public safety objectives, including the need to promote giant sequoia regeneration," the chosen alternative allowed for mechanical treatment and/or tree removal where "clearly needed for ecological restoration and maintenance or public safety." AR 13918. Where mechanical treatments are necessary,

4

"removal of trees up to 30 inches in diameter would be allowed." AR 13919. The diameter limit was established based upon "analysis of local information for the vegetation in the Monument." Id. Furthermore, Modified Alternative 6 established "the restoration of recent wildfires, logged areas and associated roads, landings, and skid trails as the highest priorities for the first two decades." Id.

In addition, Modified Alternative 6 retained a number of allocations and associated management strategies from the 2001 Framework. AR 13923. Three allocations from the 2001 Framework–the Old Forest Emphasis Area, Southern Sierra Fisher Conservation Area, and the General Forest Allocations–are replaced in the Monument Plan by a single allocation called the Fisher/Old Forest Allocation. Id. Furthermore, the Monument Plan retains several forest-wide standards and guidelines from the 2001 Framework, and it modified a number of others. AR 13924.

## II. Procedural History

California filed suit on March 3, 2005. This matter was subsequently related to Sierra Club, et al. v. Dale Bosworth, et al., Case No. C 05-00397 CRB ("Bosworth"), and People of the State of California *ex rel.* Bill Lockyer v. United States Forest Service, Case No. C 04-02588 CRB ("Fire Plan Case").[1] The parties in this matter and Bosworth consolidated cross-motions for summary judgment, which are presently pending before the Court. A Memorandum and Order in Bosworth is filed concurrently with this Memorandum and Order.

## LEGAL STANDARD

## I. NEPA

The National Environmental Policy Act of 1969 ("NEPA") is a procedural statute designed to ensure that federal agencies taking major actions affecting the quality of the human environment "will not act on incomplete information, only to regret its decision after it is too late." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989). "The

---

[1] On July 20, 2006, the Court dismissed the Fire Plan Case as moot after the Forest Service withdrew the Fire Plan altogether.

5

primary purpose of an [EIS] is to allow for informed public participation and informed decision making." Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1160 (9th Cir. 2006). To that end, NEPA's implementing regulations require that an EIS "be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them." Id. (quoting 40 C.F.R. § 1502.8). The Ninth Circuit has interpreted this regulation to require an EIS to be "organized and written so as to be readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under the [EIS]." Id. (quoting Or. Envtl. Council v. Kunzman, 817 F.2d 484, 494 (9th Cir. 1987)). Furthermore, the Court must give "substantial deference" to NEPA's implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"). Ctr. for Biological Diversity v. United States Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003) (citing Marsh, 490 U.S. at 372). "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embedded in the Act." Id. (quoting 42 U.S.C. § 4332(1)).

The Court must determine whether the Forest Service adequately satisfied its duty under NEPA; it must not substitute its own judgment for that of the agency. See Friend of the Clearwater, 222 F.3d at 556. NEPA requires that agencies take a "hard look" at the environmental consequences of their actions. Earth Island, 442 F.3d at 1159. A hard look includes consideration of "all foreseeable direct and indirect impacts." Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002). The Court may conclude that a proper 'hard look' was not conducted only if the agency's analysis is "arbitrary and capricious or contrary to the procedures required by law." Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 763 (9th Cir. 1996). A NEPA challenge requires a court to employ a 'rule of reason' to determine whether the review contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998) (citations omitted); see also Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir. 1988)

6

(holding that "agency action taken without observance of the procedure required by law will be set aside").

**DISCUSSION**

**I.     Standing**

As a threshold matter, defendants once again challenge California's standing to file this lawsuit. In a previous Order, the Court denied a motion to dismiss on this precise issue, holding that California was not pursuing this case *parens patriae* and had standing nonetheless. Defendants assert that the burden on California is increased on a motion for summary judgment, and therefore they renew their arguments on this issue on that premise. Defendants present no additional or new reasons, however, that would alter the analysis of the Court's previous ruling on this matter. Accordingly, the Court finds that plaintiff has standing to file this lawsuit.

**II.    The Incomprehensibility Argument[2]**

Plaintiff's incomprehensibility (or "lack of discernible plan") argument asserts that the Monument Plan is vague, unintelligible, and fails to satisfy the Proclamation's mandate and NEPA's requirement to inform the public of, and properly analyze, the environmental impacts of the Monument. The Ninth Circuit has characterized this as the "readability" or "understandability" requirement. See Kunzman, 817 F.2d at 493 (holding that 40 C.F.R. section 1502.8 requires that "an EIS must be organized and written so as to be readily understandable by governmental decisionmakers and by interested non-professional laypersons likely to be affected by actions taken under the EIS"). The Court must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Id. at 492; see also California v. Block,

---

[2] Plaintiff's First Cause of Action is purportedly a claim under the Administrative Procedures Act, alleging that "[t]he Forest Service's failure to comply with the Proclamation constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law." Compl. ¶ 33 (citing 5 U.S.C. § 706(2)(A), (D)). Although plaintiff's motion for summary judgment mentions this claim, it does not offer substantial legal argument or factual evidence in support of it. Moreover, plaintiff's Second Cause of Action under NEPA includes nearly identical language. Therefore, the Court will address these arguments only under NEPA.

7

690 F.2d 753, 761 (9th Cir. 1982). In order to be adequate, the EIS must provide meaningful analysis of the proposal offered by the agency. In particular, "[a]gencies shall make sure the proposal which is the subject of the environmental impact statement is properly defined." 40 C.F.R. § 1502.4(a). Here, the Monument Plan is the subject "proposal." 40 C.F.R. § 1508.23 (a "'[p]roposal' exists ... when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated"); see also AR 1982 ("The Secretary of Agriculture shall prepare, within 3 years of th[e] date [of the Proclamation], a management plan for th[e] monument and shall promulgate such regulations for its management as deemed appropriate."). Therefore, the Forest Service must ensure that the Monument Plan is properly defined.

The Forest Service acknowledged that the Plan "is not presented concisely nor in one document or location;" rather, the Plan "includes a considerable overlay of direction from both the 1988 [LRMP] and the 2001 [Framework], where that direction is consistent with the intent of the Proclamation and appropriately suited to the strategy informing Modified Alternative 6." AR 18757 (Response to Administrative Appeal). Yet plaintiff contends that regulations concerning the management of the Monument must be sufficiently discernible and concrete so as to provide guidelines and standards for those who implement the Plan to follow without bestowing unfettered discretion on the Forest Service and its agents. To this end, plaintiff makes both general and specific objections to the Plan. Generally, plaintiff argues that this "overlay" of management direction referred to in the FEIS is so vague as to be unintelligible and therefore in violation of NEPA. In other words, there is no direction within the Plan to ascertain whether the management direction is "consistent with the Proclamation" and "appropriately suited to the strategy of informing Modified Alternative 6," and therefore the Plan is not "properly defined" as required by NEPA's regulations. Specifically, plaintiff asserts that the Forest Service's assertion that standards and guidelines from the 2001 Framework were carried forward to the Monument Plan is not only confusing but also contradictory. The Court agrees with plaintiff on both arguments.

8

The Proclamation expressly states that the Forest Service shall manage the monument "to implement the purposes and provisions of this proclamation," and that the Monument Plan "will provide for and encourage continued public and recreational access and use *consistent with the purposes of the monument*." AR 1982 (emphasis added). Yet in its efforts to create a management plan pursuant to the Proclamation, the Forest Service itself explains that the Monument Plan relies primarily on the 1988 LRMP and 2001 Framework "*where that direction is consistent with the intent of the Proclamation....*" AR 18757 (emphasis added). In effect, the Forest Service reiterates the purpose of the Monument Plan in defining the Monument Plan. If the Forest Service includes such a degree of redundancy in describing a plan designed to provide guidance and information to the public, then such a plan cannot possibly be "readily underst[ood] by governmental decisionmakers and by interested non-professional laypersons." See Kunzman, 917 F.2d at 493. Nor can it fairly be described as "clearly defined" if it redundantly and abstractly defines a plan merely by reference to its purposes.

Furthermore, it appears that the Science Advisory Board, which was expressly created in the Proclamation to assist the Forest Service, noted a "need for a separate document, something that looks like a Management Plan." AR 08282 (commenting on the DEIS). As the SAB declared in its official recommendation regarding the DEIS, after noting that the Plan maximizes agency discretion at a significant cost (i.e. that no one outside the agency can properly judge the adequacy of the Plan): "Alternative VI verges on saying, 'Trust Us,' when the historical and current social context is characterized by a profound absence of trust. The management plan yet to be drafted must contain greater overall specificity." AR 13701. The Forest Service instead chose to clarify the FEIS by adding "references from the Proclamation and Framework, as well as visualization tools." AR 13709.

The Court recognizes that the Forest Service need not establish a separate management plan; indeed, incorporating by reference and relying on other environmental impact statements or guidelines is encouraged to reduce paperwork. See 40 C.F.R. § 1500.4. Yet where an agency is charged with interpreting and promulgating regulations and

9

guidelines "pursuant to applicable legal authorities," it cannot satisfy its legal obligations under NEPA by relying on the very documents and direction it is charged with interpreting. Accordingly, the Court finds that the convoluted "overlay" of previous Forest Service analyses with the intent and strategy of the Proclamation is incomprehensible and not readily understandable. Moreover, the Forest Service fails to "clearly define" the "proposal." Thus, the Monument Plan broadly violates NEPA under Kunzman and the statute's implementing regulations.

On a more specific level, the Forest Service's apparent efforts to "reduce paperwork" resulted in a Monument Plan that lacks coherent or clear guidance. In particular, three allocations from the 2001 Framework–the Old Forest Emphasis Area ("OFE"), Southern Sierra Fisher Conservation Area ("SSFCA"), and the General Forest Allocation ("GF")–are replaced in the Monument Plan by a single allocation called the Fisher/Old Forest Allocation ("FOF"). AR 13923. According to the FEIS, "[t]he FOF allocation, *in addition to the standards and guidelines for those three Framework allocations*, would include additional standards and guidelines...." AR 14178 (emphasis added). In other words, the FEIS not only retains the standards and guidelines from the 2001 Framework from the three allocations now incorporated into the FOF allocation, but it also adds more standards and guidelines. Yet, as defendants appear to recognize, the standards and guidelines that applied to the three 2001 Framework allocations directly conflict with those that appear to apply to the FOF allocation.[3] For example, the 2001 Framework OFE standards and guidelines permitted tree removal to surface and ladder fuels less than 12" diameter breast height ("dbh") and canopy could be reduced a maximum of 10 percent across a stand down to a general minimum of 50 percent. AR 2087.[4] Yet the standards and guidelines that apparently apply to the entire Monument, including the FOF, permit tree removal up to 30" dbh, and canopy can be

---

[3] In addition, the standards and guidelines that apply to the three 2001 Framework allocations also conflict with each other. This adds an additional level of confusion to the Monument Plan's management strategies.

[4] The GF and SSFCA allocations permitted tree removal up to 20" dbh and canopy reduction of 20 percent across a stand and 50 percent generally.

10

reduced by up to 30 percent to a minimum of 40 percent. The FEIS does not account for or explain these conflicts. Nor is it clear which standards and guidelines apply to which land allocations.

The Forest Service argues here that the 2001 Framework standards and guidelines apply *except* where the Monument Plan modifies them. Defs. Rep. at *3. The Court, however, disagrees. Nowhere in the FEIS–not even in the 70-page section cited generally by the Forest Service–does such an explanation exist. Moreover, where land allocations overlap one another, the FEIS ROD established a priority ordering system that did not favor new guidelines over the old. In fact, the system prioritized those allocations, favoring those with more restrictive management direction and those that are mapped. AR 13714 (FEIS, Appendix D) (listing mapped allocations, including all three of the 2001 Framework that comprise the FOF allocation in the Monument Plan). Furthermore, "[l]and allocations that provide protections to special habitats or species are placed higher in the priority ordering." Id. This priority ordering system does not include any consideration of whether the standards and guidelines are new or old. Yet despite this language, and despite the fact that the 2001 Framework guidelines are more restrictive concerning tree removal and canopy reduction, there is no analysis in the FEIS of which standards and guidelines should control which land allocations and when. See AR 13924-13929. Without some explanation, it is impossible to reconcile the conflicting directions from the FEIS regarding which standards and guidelines apply to which land allocations.

The Forest Service further argues that plaintiff's arguments merely object to the decisions the Forest Service reached, which the Service correctly notes would not be grounds for a violation of NEPA. Undoubtedly it is clear that plaintiff objects to some of the management strategies included in the Monument Plan. But here, plaintiff justifiably elucidates concerns about the relevant and applicable standards and guidelines, particularly about the confusing "overlay" between the FEIS and the 2001 Framework operates. Even if the additional standards and guidelines described in the Monument Plan were designed to supercede the Framework standards and guidelines where they conflict, it is nearly

11

impossible to determine which conflicting standards and guidelines should control. While it is not the Court's role to opine about the merits of the Forest Service's decision, it is the Court's duty to ensure that the Forest Service's Plan is coherent and readily discernible. As it pertains to the standards and guidelines to be applied to the various land allocations, the Court also finds that Monument Plan is decidedly incomprehensible.

**III. Tiering to Fire Plan**

Plaintiff contends that the Monument FEIS improperly "tiers" to the 2003 Fire Plan. Because the 2003 Fire Plan is nearly identical to the 2004 Fire Plan,[5] which the Court found to be in violation of NEPA, plaintiff argues that the FEIS violates NEPA by relying on an invalid Fire Plan.[6] Plaintiff further argues that the wildfire management guidelines in the FEIS are insufficient after the improper incorporation of the Fire Plan is excised from the FEIS.

The concept of "tiering" allows a federal agency to avoid a detailed (and repetitive) discussion by referring to another environmental document containing the necessary analysis. It is expressly permitted and recommended by NEPA's implementing regulations. 40 C.F.R. § 1502.20 ("Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."). Yet "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." Kern v. United States Bureau of Land Mgmt., 284 F.3d 1062, 1073 (9th Cir. 2002).

---

[5]Although the Court dismissed the Fire Plan Case as moot after the Forest Service withdrew the amended 2006 Fire Plan, the parties have advised the Court that this development does not affect this matter.

[6]Plaintiff has submitted excerpts of the 2003 and 2004 Fire Plans as extra-record evidence for the Court to consider. Because plaintiff's argument is that the Forest Service improperly relied upon the 2003 Fire Plan in establishing its fire management plans, and because the FEIS and other evidence in the record directly references and cites to the Fire Plan, the Court accepts the extra-record evidence as appropriate to consider. In particular, because the dispute is about whether the Forest Service relied on the Fire Plan, the fact that it is referenced in its documents is sufficient to satisfy the second exception to the record review restriction. See Inland Empire Pub. Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir. 1996) (noting that the second of four exceptions is "when the agency has relied on documents not in the record").

12

Where, as here, NEPA review is required, tiering is encouraged as long as the relevant analysis relies on a document that has been subject to an adequate NEPA analysis.

In the Fire Plan Case, the Court ruled that the 2004 Fire Management Plan was a decisional document subject to review under the APA. Fire Plan Order at *14; see also id. at *10 ("The Court finds that legal obligations flow from the Fire Plan because it is only the existence of a signed Fire Plan that authorizes on-the-ground managers to depart from the default national policy of total fire suppression throughout the entire forest."). As a decisional document, the Court further concluded that the Fire Plan was a "major federal action" subject to the requirements of NEPA. Id. at *15. Since all parties acknowledged that no NEPA review was conducted, the Fire Plan therefore violated NEPA. Id. at *17. It is not disputed that the 2003 Fire Plan, which is the Plan relevant to the Monument FEIS, was essentially identical to the 2004 Fire Plan. Therefore, for the purposes of this inquiry, the Court notes that the Fire Plan relied upon in the FEIS was invalid under NEPA. Once the invalidity of the relevant Fire Plan is established, as it is here, the question before the Court becomes whether the Monument FEIS tiers to the invalid Fire Plan.

The Forest Service urges the Court to defer to statements in the FEIS that the FEIS does not tier to the Fire Plan. See AR 18757 (noting that the FEIS refers to the Fire Plan but does not rely on it in its analysis). This argument is similar to one made in the Fire Plan Case, where the Forest Service contended that statements in the Fire Plan asserting that the Fire Plan was not meant to be a decisional document should dispose of the matter. There, the Court noted that the rationale supporting that argument, taken to its logical end, would eliminate all meaningful judicial review under NEPA and the APA. Fire Plan Order at *14. The Court further held that "[i]t is the content of the Fire Plan–not a statement of the document's intended function–that is the basis for the determination of whether it is a decisional document." Id. Similarly, here, it is the *content* of the FEIS that determines whether it tiers to the Fire Plan, not a simple statement by the Forest Service.

The text of the Proclamation expressly notes that "a century of fire suppression has led to an unprecedented failure in sequoia reproduction in otherwise undisturbed groves." AR

13

1980; see also id. ("These forests need restoration to counteract the effects of a century of fire suppression and logging."). Yet the Forest Service has a default national policy of fire suppression when wildfires erupt. The Fire Plan is the only guideline relevant to the Monument that allows for alternative methods of responding to wildfire. See Fire Plan Order at *10 ("[I]t is only the existence of a signed Fire Plan that authorizes on-the-ground fire managers to depart from the default national policy of total fire suppression throughout the entire forest."); see also AR13997 ("Fires will no longer be extinguished under a default response but will be suppressed for specific reasons."). This much is clear from the plain language of the FEIS: "The specific rationale for fires that are managed for resource benefits will be identified in the Fire Management Plan." Id.; see also AR 13524-25; AR13521 (Appendix A, Response to Comments) ("The discussion regarding the policy to suppress wildfires is beyond the scope of this FEIS."). It is therefore apparent that the Monument FEIS expressly relies on this guidance from the Fire Plan in devising a strategy to respond to wildfires consistent with the purpose and expectations of the Proclamation. See AR 13521 ("The Sequoia National Forest has a Fire Management Plan (dated July, 2003) that documents the conditions under which a land manager can allow a wildfire to burn rather than suppress it."). Simply put, this reliance on the specific strategies of the Fire Plan, without which alternatives to fire suppression–as required by the Proclamation–are unavailable, would constitute tiering under 40 C.F.R. section 1502.20 if the FEIS does not include sufficient analysis of wildfire response somewhere other than in the Fire Plan.

Defendants contend that, even if the Court were to find that the FEIS relied on the Fire Plan for fire suppression guidance, it does not tier to the Fire Plan because it includes its own, independent analysis of fire management policies. Plaintiff asserts, however, that the evidence defendants rely on in support of their argument pertains only to fire and fuels treatment, such as prescribed thinning (logging), and not to wildfire management, which is guidance on wildfire response. The Court agrees with plaintiff.

The Court recognizes that there is significant interplay between wildfire response and fire and fuels treatment, particularly where fuels treatment is designed to benefit wildfire

response. See AR 1997 (2001 Framework ROD) ("Fuel treatments increase the efficiency of firefighting efforts and reduce risks to firefighters, the public, facilities and structures, and natural resources. Fuel treatments provide a buffer between developed areas and wildlands."). Indeed, proactive and anticipatory fuel and fire treatment is an integral element of effective wildfire management. See AR 2011 ("Alternatives that emphasize fuel treatments in a strategic pattern, and place priority for treatment in watersheds with the highest fire hazard and risk, are most likely to reduce the acres and severity of wildfires."). Nevertheless, strategies and guidelines for fire and fuels treatment provide no guidance as to precisely how wildfires are to be managed, if and when they occur. To declare that "[f]uel conditions allow for efficient and safe suppression of all wildland fire ignitions" is to explain why fire and fuel treatment is beneficial to the ecosystem and to wildfire response; yet, it does not provide guidance or analysis as to *how* wildfires should be managed. AR 1997; see also AR 13985-87 (describing "the elements of fuels that are key to the assessment of wildland fire behavior"); AR 14124-33 (addressing advantages and strategies of the various alternative regarding fuels treatment and prescribed fire without any analysis of wildfire response).

Many portions of the Administrative Record to which defendants direct the Court either do not contain an analysis of fire management strategies or are not part of an analysis the Forest Service has actually conducted or adopted. See, e.g., Defs. Exs. B (SAB Comments), J (Public comments on the DEIS), N (significant issues *to be* addressed by the Forest Service), and O (charts and tables without analysis). Moreover, even where defendant directs the Court to portions of the Administrative Record that appear to be on point, the substance of the material actually cuts against defendants' argument. In the 2001 Framework ROD, which, according to defendants, provides the necessary analysis here through its incorporation into the Monument Plan, the Regional Forester states:

> A fire management plan for each national forest ... that defines a program to manage wildland and prescribed fires *will be* completed. This fire management plan *will include* the management wildland fire ignitions with the appropriate management response or range of response tactics.

15

AR 2002 (emphasis added). See also AR 2154 (2001 Framework FEIS) ("Before wildland fires can be used, national forest managers must prepare a fire management plan that describes how prescribed fires and naturally caused wildland fires will achieve resource management objectives.").[7] Rather than support defendants' contention that fire management strategies were analyzed, these portions of the record only reinforce the importance and relevance of the Fire Plan that was created subsequent to the 2001 Framework. In addition, where the FEIS adopts actual analysis conducted in the 2001 Framework, it again either generally summarizes current wildfire response techniques located elsewhere or emphasizes the benefits of fuel treatments to preventing devastating wildfires. See AR 13832. Even where the record actually addresses wildland fire response, it comes by way of a passing mention without analysis. See AR 13919 (Modified Alternative 6) ("Wildland fire use (allowing some naturally ignited fires to burn) would be included.").

In sum, the Court finds that the FEIS fails to independently analyze fire management strategies as a separate and distinct concept from fire and fuels treatment. Because the FEIS relies on this guidance from the Fire Plan, which itself is in violation of NEPA, the Court therefore concludes that the FEIS improperly tiers to the Fire Plan under Kern.

## IV.     Breach of the 1990 Mediated Settlement Agreement[8]

The 1990 Mediated Settlement Agreement represents a settlement of a dispute among a number of parties regarding administrative appeals of the 1988 LRMP for the Sequoia National Forest. Plaintiffs urge the Court to find that the Forest Service breached the MSA by abandoning the agreement and, if such abandonment was appropriate, by failing to conduct a NEPA review of such abandonment. The Forest Service, on the other hand, flatly

---

[7] To the extent that any analysis in the 2001 Framework does include fire management strategy, which the Court finds to be negligible, that Framework operated under the default policy of fire suppression which the Monument FEIS states no longer applies. See, e.g., AR 2895 (2001 Framework FEIS) ("No strategic landscape fuels management has ever been implemented in the forested ecosystems of the Sierra Nevada at an adequate spatial scale for a sufficient period of time to provide a useful reference for this environmental impact statement.").

[8] Plaintiff includes this claim for relief in the Complaint and in the Motion for Summary Judgment but it is briefed more fully in the related case. The Court addresses this claim here but incorporates the arguments and briefing from the related case.

16

asserts that, by its silence regarding the MSA, the Presidential Proclamation effectively supercedes the MSA and therefore renders it inapplicable.

The Forest Service yet again misses the point. First, as the title suggests, the MSA was a resolution to a dispute between its parties–including the parties included in these lawsuits–regarding the legality of the 1988 LRMP. It effectively altered the 1988 LRMP and thereby became a part of the LRMP, at least until the LRMP "was revised in accordance with 36 C.F.R. section 219.10(g)."[9] AR 1685. Defendants do not contend that the Proclamation or the 2001 Framework, which also amended the 1988 LRMP, satisfied the conditions of section 219.10(g). Moreover, the FEIS expressly notes that it "will amend the current [1988 LRMP], as previously amended by the [2001 Framework]." AR 13823. While it is clear that 2001 Framework amended the 1988 LRMP, it was not a revision in accordance with section 219.10. To be sure, the 2001 Framework incorporated a number of the provisions of the MSA, see AR 1676-1680, but at no point has it been established that the MSA is no longer in effect because of the 2001 Framework amendment. Rather, the 1988 LRMP remains the foundation of the Monument FEIS, as it has been amended through the years, inclusive of the MSA. Accordingly, provisions of the MSA that have been addressed in subsequent amendments are no longer effective, but the MSA nevertheless remains a part of the 1988 LRMP in all other respects until the parties agree that section 219.10(g) has been met.[10] While the Forest Service is correct that the MSA provided interim guidance, its interim term has not yet lapsed.

The Forest Service apparently recognizes as much because it does not argue that the 2001 Framework has revised the MSA in satisfaction of the terms of the MSA. Instead, it argues that the Proclamation supercedes the MSA. The Proclamation does not expressly

---

[9] 30 C.F.R. section 219.10(g) is no longer in effect, but it set forth the cycle by which forest plans were regularly revised.

[10] The Forest Service cites to a letter from the Sierra Club noting that the 2001 Framework satisfactorily addressed many of the provisions of the MSA. AR 18846. The Court recognizes that it may be "time to declare the process to amend the LMP called for in the MSA completed," id., but such a declaration has not yet officially occurred. Since there are more parties to the MSA than just the Sierra Club and the Forest Service, this letter by no means establishes that the MSA has been terminated pursuant to section 219.10(g).

17

mention the MSA. Through that silence, however, the Forest Service contends that the Proclamation superceded the MSA. See Defs.' Opp. at *19 ("The Proclamation replaced earlier agreements unless it contained an explicit reservation."). Yet the Proclamation does state that the "establishment of the monument is subject to valid existing rights." AR 1982. Nevertheless, defendants assert that "where there was an intent to preserve existing agreements the Proclamation was specific." Defs.' Opp. at *19. The Court disagrees.

In support of this argument, the Forest Service cites only to the doctrine of *expressio unius est exclusio alterius*, "which teaches that omissions are the equivalent of exclusions when a statute affirmatively designates certain persons, things, or manners of operation." ARC Ecology v. U.S. Dept. of Air Force, 411 F.3d 1092, 1100 (9th Cir. 2005). This doctrine does not apply here because the Proclamation is not silent on the MSA. To the extent that the MSA is not a part of the 1988 LRMP, it qualifies as a "valid existing right" because its termination terms have not been met. Moreover, the Proclamation does not designate certain other agreements similar to the MSA that would be preserved. Thus, even if the doctrine was relevant here, which it is not, it would not apply to the MSA. Without any other support excepting the MSA from the valid existing rights preserved by the Proclamation, the Court finds that the MSA remains in effect to the extent it has not been amended by other NEPA-compliant amendments.

This conclusion is further supported by the Forest Service's own statements after the Proclamation was established. On March 8, 2002, the Forest Service wrote a letter to all of the MSA parties advising them as to "where [the Forest Service] believe[s] the Framework does and does not meet our obligation to take certain provisions of the MSA through the Land Management Plan (LMP) amendment and the NEPA process." AR 1676. There is no mention of the Proclamation superceding the MSA, nor does the Forest Service assert that the 2001 Framework rectified all provisions of the MSA. This letter is consistent with the Court's ruling today.

The MSA is part and parcel of the 1988 LRMP until that Plan has been revised in satisfaction of the terms of the MSA, which has not yet occurred. Moreover, the chosen

18

alternative in the the FEIS directly relies on the LRMP. Accordingly, the Court finds that Modified Alternative 6 is invalid where it does not account for any relevant and applicable MSA provisions. When the Forest Service establishes a new Monument Plan in accordance with this opinion, it shall consider the remaining applicable provisions of the MSA, at least until the MSA has been terminated pursuant to its terms.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Forest Service failed to comply with NEPA in preparing a management plan for the Grand Sequoia National Monument as required by the Presidential Proclamation. Because the Plan violates NEPA in its entirety, the Court does not address some of the other claims that identify specific aspects of the Plan that may violate NEPA. Accordingly, plaintiff's motion for summary judgment is hereby GRANTED and defendant's motion for summary judgment is hereby DENIED. The parties shall meet and confer on a proposed form of judgment consistent with this opinion, which shall be filed no later than September 15, 2006. If the parties are unable to agree, each party shall file a proposed form of judgment by the same date.

**IT IS SO ORDERED.**

Dated: August 22, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE