IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, et al., | No. C 05-00397 CRB |
| Plaintiffs, | Related Case No. C. 05-0898 CRB |
| v. | **AMENDED MEMORANDUM AND ORDER** |
| DALE BOSWORTH et al., | |
| Defendants, | |
| and | |
| SIERRA FOREST PRODUCTS, | |
| Defendant-Intervenor. | |

    This is one of two lawsuits filed against the United States Forest Service and other individuals challenging the validity of the programmatic environmental management plan conducted pursuant to a presidential proclamation creating the Giant Sequoia National Monument. Plaintiffs, a conglomerate of environmental organizations, make three claims for relief here under the National Environmental Policy Act ("NEPA"): (1) the Giant Sequoia National Monument Management Plan violated NEPA for a variety of reasons; (2) the Plan violated the 1990 Mediated Settlement Agreement ("MSA"), and defendants' disregard for the MSA violated NEPA; and (3) four logging projects violate NEPA. Now pending before the Court are cross-motions for summary judgment on all claims, as well as defendant-

intervenor's motion to increase the bond. The Court previously preliminarily enjoined two of the four logging projects at issue in the third claim for relief.

In a Memorandum and Order concurrently issued today in the related case, <u>California v. United States Forest Service</u>, Case No. C 05-00898 CRB, the Court held that the purported Monument Plan violated NEPA. The Court hereby adopts and incorporates the opinion in the companion case and GRANTS plaintiffs' motion for summary judgment on the first two claims for relief in this action. This Memorandum and Order solely addresses plaintiffs' third claim for relief regarding the timber sales. After carefully considering the lengthy administrative record, the parties' briefing on this motion and the two previous motions for preliminary injunction, and with the benefit of oral argument, the Court hereby GRANTS plaintiffs' motion for summary judgment on the third claim for relief and DENIES defendants' and defendant-intervenor's motions for summary judgment.

## BACKGROUND

By Executive Proclamation 7295, President Clinton created the Giant Sequoia National Monument. Administrative Record ("AR") 1979-1983. As it applies to this dispute, the Proclamation preserved valid existing rights. Moreover, it expressly stated that timber sales under contract as of the date of the Proclamation or those with a decision notice signed in 1999 "may be completed consistent with the terms of the decision notice and contract." AR 1982. The Proclamation further prohibited timber production within the Monument, and "no part of the monument shall be used in a calculation or provision of a sustained yield of timber from the Sequoia National Forest." <u>Id.</u> The Proclamation also prohibited the removal of trees other than for personal use unless it is "clearly needed for ecological restoration and maintenance or public safety." <u>Id.</u> Finally, the Proclamation stated: "Laws, regulations, and policies pertaining to administration by the Department of Agriculture of grazing permits and timber sales under contract as of the date of this proclamation on National Forest System lands within the boundaries of the monument shall continue to apply to lands within the monument." AR 1983.

//

Four timber sales are at issue in this litigation, two within the boundaries of the Monument and two adjacent to the Monument. The two located within the Monument–the Saddle Fuels Reduction Project ("Saddle Project") and the Revised White River Project ("White River Project")–and the Revised Ice Timber Sale and Fuels Reduction Project ("Ice Project") were analyzed in Environmental Assessments ("EA") and were the subject of decision notices in 1999. These three projects were existing timber sales expressly permitted by the Proclamation. The Frog Project Area Analysis ("Frog Project") was analyzed through an environmental assessment and received a decision notice in 2001. For each project, the Forest Service reached a Finding of No Significant Impact ("FONSI") as to the pacific fisher or spotted owl, and therefore an EIS was not conducted. All of the EA's relied on the 1993 CASPO Guidelines to limit any adverse impacts to the spotted owl and to the pacific fisher, to the extent the mitigation measures also applied to the fisher. On October 26, 2005, the Forest Service produced Supplemental Information Reports ("SIRs") regarding the Saddle Project and the Ice Project, concluding that a supplemental EIS was unnecessary because the projects would have an "insignificant yet beneficial impact" on the pacific fisher. In all of the environmental reviews of these projects, the Forest Service stated that they "may affect individual" fisher but are not likely to "result in a trend toward federal listing or loss of viability" of the species. See, e.g., Ice Project EA at *59.

**PROCEDURAL HISTORY**

Plaintiffs filed suit on January 27, 2005, and submitted a Second Amended Complaint on November 2, 2005. On August 9, 2005, the Court permitted Sierra Forest Products to intervene as to the third claim for relief. The Court entered preliminary injunctions against the Saddle Fuels Reduction Project on September 9, 2005, and against the Ice Timber Sale on November 14, 2005, temporarily halting any logging activities by intervenor. In both decisions, the Court concluded that plaintiffs would likely succeed on the merits of their claim because significant new information emerged regarding the fisher after the original NEPA reviews, and because the Forest Service did not conduct a proper "hard look" at that

3

information under NEPA. The Court now addresses cross-motions for summary judgment and plaintiffs' request to enter a permanent injunction as to the four logging projects.

**LEGAL STANDARD**

The issue presently before the Court requires an inquiry into whether the Forest Service properly considered and analyzed new information subsequent to the original environmental reviews and approvals of the four timber projects. "[T]he Forest Service's failure to evaluate in a timely manner the need to supplement the original EIS in light of ... new information violate[s] NEPA." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 559 (9th Cir. 2000). However, even where the agency has failed to satisfy NEPA in this regard, it can rectify the violation after the onset of litigation by conducting an appropriate analysis while the case is still pending. See id. at 560-61. Where this analysis amounts to a "hard look," injunctive relief is inappropriate. See id. ("[I]t would serve no useful purpose ... to order the Forest Service to prepare studies that the Forest Service has already completed and that cannot be successfully challenged."). "A hard look should involve a discussion of adverse impacts that does not improperly minimize negative side effects." Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006). Thus, the Forest Service must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists." Id. (citing Native Ecosystems Council v. United States Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005)).

"In reviewing an agency's decision not to prepare an EIS under NEPA, we employ an arbitrary and capricious standard that requires us to determine whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant.'" Native Ecosystems, 428 F.3d at 1239 (quoting Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001)). An agency cannot rest on the conclusions made by an EIS or EA but instead maintains a continuing obligation to take a "hard look at the environmental effects of its planned action, even after a proposal has received initial approval." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 374 (1989).

4

That continuing duty further requires a federal agency to gather and evaluate new information relevant to the environmental impact of its actions and then "make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures." Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1023, 1024 (9th Cir. 1980).

The Ninth Circuit has held that an EIS "*must* be prepared if substantial questions are raised as to whether a project ... *may* cause significant degradation of some environmental factor." Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998) (citations omitted) (emphasis in original). Yet "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Marsh, 490 U.S. at 374; see also Thomas, 137 F.3d at 1150 (noting that a plaintiff need not show that "significant effects *will in fact occur*," but rather must show that there are "substantial questions whether a project may have a significant effect") (emphasis added). "Whether a project is significant depends on both the project's context and its intensity." Native Ecosystems, 428 F.3d at 1239 (citing 40 C.F.R. § 1508.27). The intensity of a project is evaluated on various factors and can include impacts that are both beneficial and adverse. 40 C.F.R. § 1508.27(b)(1). The following factors are relevant here: (1) "The degree to which the effects on the quality of the human environment are likely to be highly controversial," id. § 1508.27(b)(4); "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," id. § 1508.27(b)(5); "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," id. § 1508.27(b)(7); and "[t]he degree to which the action may adversely an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973," id. § 1508.27(b)(9).

Like the decision whether to prepare an EIS in the first instance, a supplemental EIS should be prepared if: (1) "there remains 'major Federal actio[n]' to occur," and (2) "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already

5

considered." Marsh, 490 U.S. at 374. Under the arbitrary and capricious standard applied here, the Court uses a "rule of reason" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." See Thomas, 137 F.3d at 1149 (quoting Marsh, 490 U.S. at 378). "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency." Id. (quoting Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993)).

## DISCUSSION

### I. Failure to Exhaust Administrative Remedies

As a threshold matter, defendants argue that several of the plaintiffs failed to exhaust their administrative remedies on some or all of the claims prior to filing this lawsuit and they should therefore be dismissed from the lawsuit on those grounds. Defendants, however, do not dispute that the Sierra Club and Tule River Conservancy exhausted all the requisite administrative remedies, which thereby informed the Forest Service of the claims and arguments at issue here. As a result, the Court finds that plaintiffs have adequately exhausted the administrative remedies for two reasons.

First, there is no dispute that the Forest Service was put on notice of plaintiff's claims and arguments. Since the purpose of the exhaustion requirement is to ensure that agency "be given first shot at resolving a claimant's difficulties," there is no question that the plaintiffs have met the underlying rationale supporting the exhaustion requirement. See Thomas, 305 F.3d at 965. Second, it would be futile to require the additional plaintiffs to exhaust their administrative remedies where such exhaustion would not have any effect on the Forest Service's response. See Northcoast Envt'l Ctr. v. Glickman, 1996 U.S. Dist. LEXIS 22845 at *10-11, *aff'd*, 136 F.3d 660 (9th Cir. 1998) (holding that where at least one plaintiff satisfied the exhaustion requirements on all claims, "it would be futile to require the remaining defendants to so as well"). Where, as here, the posture and substance of a litigation would not have been altered if all plaintiffs had exhausted their administrative remedies, and such exhaustion would be futile nonetheless, the Court finds that it is not

6

necessary for all plaintiffs to exhaust their administrative remedies insofar as at least one plaintiff has put the Forest Service on notice of all of the arguments and issues relevant here.

**II.     Timber Contracts**

   **A.     Saddle, Ice and White River Projects**

On September 9, 2005, the Court entered a preliminary injunction against a commercial logging contract called the Saddle Fuels Reduction Project ("Saddle Project"). See Sierra Club v. Bosworth, 2005 WL 2204986 (N.D. Cal. Sep. 09, 2005) (No. C 05-00397 CRB) ("Saddle Order"). On November 14, 2005, the Court also entered a preliminary injunction against a similar logging contract called the Ice Timber Sale and Fuels Reduction Project ("Ice Project"). See Sierra Club v. Bosworth, 2005 WL 3096149 (N.D. Cal. Nov. 14, 2005) (No. C 05-00397 CRB) ("Ice Order"). Both preliminary injunctions halted ongoing logging activity by intervenor Sierra Forest Products. Plaintiffs now ask the Court to permanently enjoin these projects until a proper NEPA review is conducted on the significant new information that has developed since the decision notices and NEPA reviews regarding these projects.

In addition, the parties do not dispute that the White River Project, though not subject to a preliminary injunction, is a project similarly situated to the Saddle Project in that it received a near-identical NEPA review and was subject to the provisions of the Proclamation. Moreover, because the White River NEPA analysis directly related to the Ice Project, and because the Ice Supplemental Information Report ("Ice SIR") addressed the White River Project, the Court had the occasion to review that project as part of the Ice Order. Thus, the Court finds that the White River Project is subject to the same analysis as the Saddle and Ice Projects.

   **1.     Major Federal Action**

Defendants contend that these projects are no longer ongoing major federal actions because they have already been approved. To this end, defendants attempt to place this case under Norton v. Southern Utah Wilderness Alliance (SUWA), 542 U.S. 55 (2004), as it distinguishes Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989). In Marsh,

7

the Supreme Court cited the regulations of the Council on Environmental Quality, the regulating agency under NEPA, in holding that federal agencies must supplement an EIS if there "are *significant* new circumstances or information relevant to environmental concerns and bearing on the *proposed action* or its impacts." Marsh, 490 U.S. at 372 (quoting 40 C.F.R. § 1502.9(c)(1)(ii)) (emphasis added). The Court noted that NEPA requires agencies to take a "hard look" "at the environmental effects of their planned action, even after a proposal has received initial approval." Id. at 374. Ultimately, the Court determined that new information about the environmental impacts of a federally-funded dam yet to be constructed must receive a supplemental hard look. Id. at 385. In that case, however, a hard look was properly done without a supplemental EIS. Id..

In SUWA, the Court distinguished Marsh by noting that the dam at issue in Marsh had yet to be completed, whereas a programmatic land use plan had already received final approval from the Bureau of Land Management. SUWA, 542 U.S. at 73. As a result, supplementation of the EIS was unnecessary because there was no longer a "proposed action." Id. The Ninth Circuit has had one opportunity to address the SUWA distinction. See Cold Mountain v. Garber, 375 F.3d 884 (9th Cir. 2004). In that case, the Forest Service issued a special use permit to the Montana Department of Livestock to operate a bison capture facility. Environmental groups challenged the permit under NEPA in part because of new information that emerged after the permit was issued regarding violations of restrictions outlined in the permit. Id. at 891-892. The court determined without any analysis that the permit had been approved and issued, and therefore there was "no ongoing 'major Federal action' requiring supplementation." Id. at 894.

Here, the Court must determine whether a timber sale contract that has been approved by the Forest Service and awarded to a third party remains a "proposed action" that requires supplementation if new significant information emerges. If not, and if the approval of the contract "completes" the major federal action, then the Forest Service does not have an obligation to supplement its EIS.

8

The Court finds that the timber projects are major ongoing federal actions. First, the timber projects, like the dam construction project, are site-specific projects. By contrast, the major federal action in <u>SUWA</u> was a programmatic-level land use plan that was completed upon initial approval. And in <u>Cold Mountain</u>, the court gave no indication that the Forest Service maintained any ongoing oversight or involvement in the administration of the special use permit once it was issued. Where an action has not yet been completed, the agency has "a continuing duty to gather and evaluate new information relevant to the environmental impacts of its actions." <u>Friends of the Clearwater v. Dombeck</u>, 222 F.3d 552, 559 (9th Cir. 2000). Based on a close reading of these cases, the Court finds that the timber projects are akin to the site-specific dam construction project at issue in <u>Marsh</u> rather than a programmatic-level land use plan at issue in <u>SUWA</u>.

Second, unlike the special use permit in <u>Cold Mountain</u>, the timber sales contracts permit the Forest Service to terminate the contracts if it determines that continuation of the projects would, as relevant here: (1) "cause serious environmental degradation or resource damage;" or (2) "adversely affect species listed as threatened or endangered under the Endangered Species Act ... or a sensitive species" by the Forest Service. <u>See</u> Timber Sales Contracts, ¶ Termination. This clause permits the Forest Service to unilaterally terminate the contract if its original environmental analysis has been altered by, for example, significant new information regarding its effects on a native species. As a result, approval of the contracts is not effectively final if additional information would alter the environmental analysis.

Third, all of the timber sale contracts required the Forest Service's written approval of the operating plan prior to the commencement of logging. <u>See</u> Decl. of Paul S. Miller, Exhs. A-D (Timber Sale Contracts, Plan of Operation) ("Forest Service written approval of the plan of operation is prerequisite to commencement of Purchaser's Operations."). In fact, just prior to the commencement of the Saddle Project, the Forest Service approved such an operating plan for the Project. <u>See</u> Decl. of Alex Kriegsman, Exh. C. This further distinguishes this case from the special use permit at issue in <u>Cold Mountain</u>, which did not

9

require an operating plan approval following the initial approval. Here, the Court therefore finds that final approval of the project had yet to be executed at the time the Forest Service awarded the contract and completed its initial NEPA reviews. Moreover, "operating plans are considered to be major federal actions under NEPA, requiring preparation of an EIS." City of Tenakee Springs v. Block, 778 F.2d 1402, 1404 (9th Cir. 1985). Therefore, Marsh controls and supplementation of the original NEPA documents is necessary if there is significant new information that might alter the environmental analysis.

### 2. Significant New Information

The Court has twice previously had an opportunity to review the record as it pertains to new information regarding the proposed timber projects and its effects on the Pacific fisher. In the Saddle and Ice Orders, the Court concluded that new information about the fisher–in particular, a 2004 Fish and Wildlife Service finding that the fisher meets the criteria to be listed as an endangered species, and that the southern Sierra fisher is a genetically distinct species in danger of extirpation; and defendants' concession that as many as 23 of what may be as few as 50 living female fisher may be affected by the projects–constituted significant new information that requires a supplemental "hard look" at the environmental impacts of the logging projects. See Saddle Order at *6-10; Ice Order at *13-16 (analyzing factors under 40 CFR section 1508.27). Furthermore, the Court concluded that a Supplemental Information Report prepared after litigation commences can satisfy the Forest Service's duty to take a "hard look" at significant new information. Nevertheless, those that were conducted here failed to take an appropriate "hard look." See Ice Order at *8-11. The Court further concluded that a one-paragraph assessment of the cumulative impacts of the projects and an unsupported conclusion that the projects "may affect individual fisher but would not likely result in a trend toward federal listing or loss of viability of the fisher" was also insufficient to constitute a "hard look" at the additional information. See Ice Order 14, 16-18 (quoting October Ice SIR at *19); see also Earth Island, 442 F.3d at 1172 ("FEISs must respond explicitly and directly to conflicting views in order to satisfy NEPA's

10

procedural requirements."). In sum, the Court found that plaintiffs presented serious questions as to the sufficiency and adequacy of the Forest Service's conduct.

The Court is now asked to enter summary judgment in favor of plaintiffs and enter a permanent injunction against the continuation (or commencement) of the logging projects. Notably, the record before the Court has not changed since the Ice Order,[1] and the Forest Service has apparently not made any additional efforts to conduct a supplemental environmental review of the impacts of the logging projects. The Ninth Circuit, however, has had two more occasions to address similar circumstances since the Ice Order. See Earth Island, 442 F.3d at 1159 (holding that the Forest Service failed to take a hard look at the effects of two logging projects on the California spotted owl); Ecology Ctr., Inc. v. Austin, 430 F.3d 1057, 1067 (9th Cir. 2005). In both instances, the Court of Appeals has further strengthened the legal underpinnings of the Court's decisions addressing the preliminary injunctions.

In Ecology Center, the court addressed whether an EIS adequately addressed the environmental effects on the black-backed woodpecker of a post-wildfire logging project in the Lolo National Forest. 430 F.3d at 1067. The court concluded that "[t]he EIS fails to adequately explain the basis for the Forest Service's conclusion that eliminating a portion of the newly-created habitat will not adversely affect the black-backed woodpeckers' viability." Id. The EIS at issue there stated that "even though salvaging post-fire habitat may negatively impact individual black-backed woodpeckers, it will 'not likely result in a trend towards federal listing.'" Id. The court stated that "[w]ithout more, this general statement regarding the possible impact and risk involved do[es] not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Id. (internal citations and quotations omitted). The Forest Service's conclusion here is eerily similar to

---

[1] The Court notes that there is one minor addition to the record. Intervenor submitted a letter from the Fish and Wildlife Service clarifying the August 31, 2005, letter regarding the Saddle Project. While the Court appreciates the clarification efforts, it finds that this letter is more appropriately suited to be included as part of a 'hard look' at the environmental impacts of the project. Since the Forest Service did not consider this letter as part of its supplemental review, it is therefore irrelevant to the inquiry here.

11

that which the Ecology Center court ruled to be insufficient to constitute a hard look. See October Ice SIR at *19 (concluding that the Ice Project "may affect individual fisher but would not likely result in a trend toward federal listing or loss of viability of the fisher").

Moreover, the Ninth Circuit recently identified "a disturbing trend in the [Forest Service's] recent timber-harvesting and timber-sale activities." Earth Island, 442 F.3d at 1177-78 (listing eight cases since 2002 where courts found the Forest Service to have violated environmental laws relating to logging projects). Noting the "substantial financial interest in the harvesting of timber," the court stated: "We regret to say that in this case, like the others just cited, the [Forest Service] appears to have been more interested in harvesting timber than in complying with our environmental laws." Id. at 1178. It appears from the record before the Court that, like in Earth Island and the cases cited therein, the Forest Service's interest in harvesting timber has trampled the applicable environmental laws.

Based on a consistent line of Ninth Circuit case law, as more fully analyzed in the Saddle and Ice Orders, and the extensive record here, the Court finds that the Forest Service has failed to conduct a proper "hard look" at the significant new information regarding the impacts of the timber projects on the Pacific fisher. Accordingly, the Court hereby GRANTS plaintiffs' motion for summary judgment and further ENTERS a permanent injunction against the Saddle, Ice and White River Projects until a proper supplemental NEPA review has been conducted.

**B.     Frog Project**

There are several differences between the Frog Project and the other timber projects. First, the Frog Project is located outside of the Monument. Moreover, the initial sales contract, NEPA review and decision notice on the Frog Project were conducted *after* the Presidential Proclamation was executed and therefore this project is not subject to the provisions of the Proclamation. Second, because plaintiffs filed a Second Amended Complaint after the parties established the briefing schedule for these cross-motions for summary judgment, the administrative record relating to the Frog Project was not filed until after plaintiffs' were required to file their opening memorandum in support of their motion

12

for summary judgment. Third, the Court has not had a previous occasion to review the NEPA documents relating to the Frog Project.

As a threshold matter, defendants argue that plaintiffs waived their arguments regarding the Frog Project by not including them in their opening brief. The Court, however, finds that plaintiffs did not waive their claims concerning the Frog Project by not including arguments pertaining to the Frog Project in their opening memorandum. The Court granted plaintiffs leave to file a Second Amended Complaint, which included a claim pertaining to the Frog Project. Plaintiffs' reply brief was their first opportunity to address this claim on the basis of a record before the Court. Moreover, defendants had an opportunity to respond to plaintiffs' arguments and therefore suffered no prejudice as a result of the delayed argument. Thus, it is appropriate for the Court to address the merits of plaintiffs' claim.

The Court further finds that the conclusions regarding the other three logging projects apply equally to the Frog Project. Most importantly, the Court's ruling above rests on the existence of significant new information regarding the Pacific fisher that has not been appropriately analyzed by the Forest Service. That information, particularly the Fish and Wildlife Service Finding that the southern Sierra fisher is a candidate for listing as an endangered species and a genetically distinct species, and the supporting evidence thereof, came to light after the Frog decision notice and NEPA review. Therefore, the Forest Service is required to take a "hard look" at this new information in conjunction with the Frog Project. There is no dispute that no supplemental NEPA review of the Frog Project has been conducted yet. Accordingly, the Court hereby GRANTS plaintiffs' motion for summary judgment and ENTERS a permanent injunction against execution of the Frog Project until a satisfactory supplemental NEPA review has been conducted concerning the recent and significant new information on the Pacific fisher.

## CONCLUSION

For the foregoing reasons, the Court finds that the Forest Service has failed to conduct an adequate and sufficient "hard look" at significant new information pertaining to the Pacific fisher. Thus, the four timber projects at issue here are hereby permanently

13

ENJOINED until the Forest Service conducts an adequate and sufficient supplemental NEPA review. Accordingly, intervenor's motion to increase bond is DENIED. The parties shall meet and confer on a proposed form of judgment consistent with this opinion, which shall be filed no later than September 15, 2006, and which shall include interim guidance until the Forest Service conducts a proper NEPA analysis. If the parties are unable to agree, they shall each submit separate proposed forms of judgment by the same date for the Court's consideration.

**IT IS SO ORDERED.**

Dated: August 25, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE